UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION


UNITED STATES OF AMERICA,            )
                                     )
            V.                       )      5:08-CR-343-D-1
                                     )
ROBERT CARL STOKES,                  )
                                     )
            DEFENDANT.               )
_____     )


MOTIONS HEARING
DECEMBER 19, 2008
BEFORE THE HONORABLE JAMES C. DEVER III
U. S. DISTRICT JUDGE



APPEARANCES:

FOR THE GOVERNMENT:

MR. JOSHUA HOWARD
MR. STEVEN WEST
ASST. U.S. ATTORNEY
310 NEW BERN AVE.
RALEIGH, NC



FOR THE DEFENDANT:

MR. KIERAN SHANAHAN, ESQ.
MR. STEVEN MCCALLISTER, ESQ.
MS. MELISSA PULLIAM, ESQ.
SHANAHAN LAW GROUP
128 E. HARGETT STREET
RALEIGH, NC



COURT REPORTER:  DONNA J. TOMAWSKI
STENOTYPE WITH COMPUTER AIDED TRANSCRIPTION

DECEMBER 19, 2008

1

2          **THE COURT:**  GOOD MORNING, COUNSEL.  WE'RE HERE

3    TODAY IN CONNECTION WITH AN ORDER THIS COURT ENTERED ON

4    THE 16TH OF DECEMBER CONCERNING AN APPLICATION FILED BY

5    THE UNITED STATES FOR A POST-INDICTMENT RESTRAINING ORDER

6    CONCERNING THE DEFENDANT, ROBERT CARL STOKES.  MR. STOKES

7    WAS INDICTED BY A GRAND JURY SITTING IN THE EASTERN

8    DISTRICT OF NORTH CAROLINA.  THE UNITED STATES HAS FILED

9    AN APPLICATION AND REQUESTED A POST-INDICTMENT RESTRAINING

10   ORDER.

11       MR. HOWARD, IS THE GOVERNMENT READY TO PROCEED?

12          **MR. HOWARD:**  WE ARE, YOUR HONOR.

13          **THE COURT:**  MR. SHANAHAN, IS THE DEFENDANT READY

14   TO PROCEED?

15          **MR. SHANAHAN:**  WE ARE, JUDGE.

16          **THE COURT:**  ALL RIGHT.  MR. HOWARD, THE COURT

17   HAS RECEIVED OBVIOUSLY THE MOTION THAT YOU FILED AND THE

18   APPLICATION AND THE PROPOSED RESTRAINING ORDER AND THEN

19   YOUR MEMORANDUM IN SUPPORT OF THAT.  DID YOU WANT TO

20   OFFER -- WELL, FIRST I'D LIKE TO HEAR ARGUMENT FROM YOU IN

21   CONNECTION WITH YOUR APPLICATION, TO THE EXTENT THAT YOU

22   JUST WANT TO SUMMARIZE PERHAPS WHAT'S IN YOUR PAPERS, AND

23   TO THE EXTENT YOU WANT TO PRESENT EVIDENCE, THEN WE'LL

24   HEAR FROM MR. SHANAHAN ON BEHALF OF MR. STOKES.

25          **MR. HOWARD:**  THANK YOU, YOUR HONOR.  WE WOULD

1    JUST SUMMARIZE AND OTHERWISE REST ON THE PAPERS BEFORE THE

2    COURT WHICH YOU HAVE HAD AN OPPORTUNITY TO REVIEW.  THE

3    MATTER IN CONTROVERSY IS THE FACT THAT A MAN NAMED LANCE

4    GILMAN IS IN WILSON, NORTH CAROLINA, HE'S REPRESENTED BY

5    JIM AYERS OF NEW BERN.  HE'S SITTING ON A ROUGHLY $350,000

6    PAYMENT, WHICH IS THE UNIVERSE OF FUNDS AT ISSUE TODAY.

7        WE MIGHT START, YOUR HONOR, NOW THAT THE DEFENDANT

8    IS --

9        **THE COURT:**  THAT PAYMENT WAS SUPPOSED TO GO TO

10   HALLMART BUT THEN BLEASE COMPANY WAS CREATED AND BLEASE

11   COMPANY IS OWNED OR CONTROLLED BY THE DEFENDANT'S WIFE; IS

12   THAT THE FACTS?

13       **MR. HOWARD:**  PRECISELY, YOUR HONOR.  THE

14   DEFENDANT, CARL STOKES, SOLD HIS CROP INSURANCE LINE OF

15   BUSINESS TO MR. GILMAN.  SOMETIME AFTER THAT, ON A DATE WE

16   DON'T IMMEDIATELY KNOW, MR. STOKES PURPORTS TO HAVE

17   TRANSFERRED THAT RIGHT TO COLLECT TO HIS WIFE IN A COMPANY

18   THAT SHE CONTROLS.

19       YOUR HONOR, IT'S THE GOVERNMENT'S POSITION THAT'S THE

20   DEFENDANT'S ASSETS AND THEY'RE FORFEITABLE UNDER BOTH

21   SUBSTITUTE AND DIRECT THEORIES.  YOUR HONOR, IT'S ALSO OUR

22   VERY STRONG POINT TODAY, WE'RE NOT ASKING FOR YOU TO ORDER

23   THE FORFEITURE, WE'RE SIMPLY ASKING YOU TO GIVE US THE

24   OPPORTUNITY TO SECURE THEM SO THAT IF AND WHEN MR. STOKES

25   IS CONVICTED, THE FUNDS WILL BE AVAILABLE.

1    NOW, YOUR HONOR, WE BELIEVE THE PROBABLE CAUSE

2  SHOWING ON THE FACES OF THE AFFIDAVIT AND THE BRIEFS ARE

3  SUFFICIENT.  WE DO HAVE A POWER POINT, IF THAT WOULD HELP

4  YOU.  WE COULD WALK THROUGH THAT VERY QUICKLY.

5    BUT NONETHELESS, YOUR HONOR, WE'RE STANDING HERE

6  TODAY -- AND I ALSO HAVE THE BENEFIT OF MR. WEST, WHO'S

7  OUR IN-HOUSE GURU ON THAT POINT -- WONDERING IF THE

8  DEFENDANT IS GOING TO ARGUE, AS HE MAY, THAT THESE ARE NOT

9  HIS ASSETS WHATSOEVER ANYMORE, THEN HE HAS NO STANDING.

10  HIS EFFORT TO ISOLATE HIMSELF FROM THOSE ASSETS DIVESTS

11  HIMSELF FROM AN OPPORTUNITY TO CHALLENGE THIS HERE TODAY.

12    IF HE'S GOING TO ARGUE THAT THEY ARE HIS ASSETS, THEN

13  GOOD, WE WILL BE GLAD TO EXPLAIN TO THE COURT THEN FURTHER

14  WHAT'S ALREADY IN OUR BRIEFS, THE BASIS FOR FORFEITURE

15  THERE.

16    **THE COURT:**  OKAY.  ALL RIGHT.  WELL, BEFORE I

17  HEAR FROM THE AGENT, I WANT TO HEAR FROM MR. SHANAHAN ON

18  MR. STOKES' POSITION.  DOES HE CLAIM THAT THIS IS HIS

19  $350,000?

20    **MR. SHANAHAN:**  JUDGE, LET ME ANSWER YOUR

21  QUESTION.  THE ISSUE IS, DOES HE HAVE STANDING TO PROCEED?

22  THE ANSWER TO THAT QUESTION IS YES.  AND BECAUSE, AS

23  DISCLOSED TO THE GOVERNMENT, THE BLEASE COMPANY HAS, BY

24  WRITTEN DOCUMENT, AGREED TO LEND MR. STOKES $250,000 FOR

25  PURPOSES OF HIS ATTORNEY'S FEES.

1    REALLY WHAT'S GOING ON HERE, JUDGE, IS AN INCREDIBLE

2   END RUN AROUND, NOT ONLY THE CONSTITUTION, BUT

3   SPECIFICALLY MY CLIENT'S 6TH AMENDMENT RIGHT TO COUNSEL

4   AND COUNSEL OF HIS CHOICE.

5    I WOULD GIVE YOU JUST WHAT I HOPE HELPS SET THE

6   CONTEXT OF WHAT BROUGHT US HERE TODAY.  MR. GILMAN IS

7   ACTUALLY -- HAD WORKED FOR MY CLIENT FOR A NUMBER OF

8   YEARS.  WHEN THE GOVERNMENT EXECUTED A SEARCH WARRANT BACK

9   IN 2006, THEY IMMEDIATELY GOT THE COOPERATION OF

10  MR. GILMAN.  THAT LED ULTIMATELY TO AN INTERVIEW OF

11  MR. GILMAN ON NOVEMBER 11, WHICH IS ATTACHED TO THE PLEA

12  EXHIBIT.  IF THE REPORT OF INTERVIEW IS CORRECT, IT

13  STARTED AT THREE IN THE MORNING AND ENDED AT THREE IN THE

14  AFTERNOON.

15    IN THAT CONVERSATION, GILMAN LAYS OUT WHAT HE SAYS

16  WAS HIS RELATIONSHIP ABOUT THIS ALLEGED PAYMENT, AND HE

17  MAKES REFERENCE TO OWING THE MONEY TO STOKES, AND MAKES

18  OTHER ASSERTIONS WHICH I BELIEVE FORM THE BASIS OF WHAT

19  THE GOVERNMENT THINKS IS A TRANSACTION.  IT'S NOT PROVEN

20  UP IN ANY WAY AND, YOU KNOW, THEIR BRIEF IS FILLED WITH

21  THINGS THAT ARE NOT SUPPORTED BY FACTS THAT ARE CONTAINED

22  IN THEIR AFFIDAVIT.

23    BUT THE IMPORTANCE OF THAT, JUDGE, IS THAT THE

24  GOVERNMENT KNEW BEFORE THEY INDICTED GILMAN ABOUT THIS

25  PAYMENT.  SO ON NOVEMBER 12, THEY INDICT STOKES AND THEY

GIVE NOTICE OF CRIMINAL FORFEITURE, AND THEY MAKE

REFERENCE TO THIS $3,400,000.

I THINK IT'S IMPORTANT FOR YOUR CONSIDERATION TODAY

TO KNOW THAT THE INDICTMENT ALLEGES ONLY THAT THIS MONEY,

THIS $3.4 MILLION, CAME ABOUT AS A RESULT FROM THE CROP

SEASONS 2005 AND 2006.  THE INDICTMENT GOES ON TO SAY,

NOTICE OF SUBSTITUTED PROPERTY INCLUDES HIS HOME, THE

BUSINESS OFFICE WHERE HALLMART IS LOCATED, AND THE LOT AT

ATLANTIC BEACH.  NO REFERENCE TO THIS GILMAN, NONE.

WHAT HAPPENED ON DECEMBER 5 WAS THAT I HAD A MEETING

HERE IN THIS BUILDING WITH THE PROSECUTOR FOR THE PURPOSE

OF REVIEWING DISCOVERY, ALSO TO DISCUSS THE PRETRIAL

ORDER, WHICH WE HAVE SUBMITTED FOR YOUR CONSIDERATION.  AT

THAT TIME THE GOVERNMENT BROUGHT UP THE ISSUE OF

SETTLEMENT.  THEY DISCLOSED ALSO THAT LANCE GILMAN WAS

COOPERATING AND HAD GIVEN A DETAILED INTERVIEW.

IN THAT CONTEXT OF OUR SETTLEMENT DISCUSSIONS, THE

GOVERNMENT SAID, YOU KNOW, IF WE DON'T GET A PLEA

AGREEMENT WORKED OUT WE'RE GOING TO SUPERSEDE THE

INDICTMENT.  AND, BY THE WAY, WE'RE GOING TO LOOK AT

THOSE, WE UNDERSTAND THERE'S A PAYMENT DUE TO STOKES FROM

GILMAN.  I IMMEDIATELY SAID, DON'T DO THAT BECAUSE MY FEE

IS TIED UP IN THAT.  IMMEDIATELY DISCLOSED THAT TO THEM.

AND I SAID, BY THE WAY, I THINK YOU ARE WRONG IN YOUR

REPRESENTATION THAT GILMAN OWES THIS MONEY TO STOKES.

1          I JUST SAID THAT BECAUSE -- I DIDN'T HANDLE THE

2    TRANSACTIONS BUT MY PARTNER, A GOOD FRIEND, MR. RILEY

3    WHO'S HERE THIS MORNING, DID.  WHAT I DID, AS A MATTER OF

4    FULL DISCLOSURE, AFTER I LEFT THE MEETING WITH THEM, WAS I

5    CONFERRED WITH THEM TO UNDERSTAND THE TRANSACTION.  I JUST

6    WASN'T INVOLVED IN WHAT HAPPENED BACK IN '06 AFTER THE

7    RAID.  THERE WERE REGULATORY THINGS WITH THE STATE OF

8    NORTH CAROLINA ABOUT HIS INSURANCE AGENCY.  IT WAS THE

9    STATE GOVERNMENT THAT SAID HE NEEDED TO SELL HIS AGENCY.

10   HE DIDN'T WANT TO DO IT.  MR. IVEY IS HERE TO TESTIFY

11   ABOUT ALL OF THESE THINGS, BUT JUST BY WAY OF FORECAST.

12         SO A TRANSACTION OCCURRED WHERE HE DID SELL HIS

13   AGENCY TO MR. GILMAN.  THE ARRANGEMENTS ARE ORDINARY AND

14   CUSTOMARY, AND THIS IS IMPORTANT BECAUSE IT GOES TO, I

15   THINK, THE GOVERNMENT'S LACK OF KNOWLEDGE AND

16   MISUNDERSTANDING IN THE PAPERS.  IT IS CUSTOMARY, WHEN YOU

17   ARE SELLING AN INSURANCE AGENCY, YOU DON'T KNOW WHAT THE

18   REVENUES MAY BE IN FUTURE YEARS OR, YOU KNOW, ESPECIALLY

19   IF YOU HAVE A PERSON THAT'S BEEN LONG TIME ASSOCIATED WITH

20   IT AND THERE HAS BEEN THIS RAID AND IT'S VERY PUBLIC, SO

21   YOU SELL THE ASSET.  HE SOLD PART OF THE BUSINESS TO

22   GILMAN AND WHAT HAPPENED WAS HIS WIFE, WHO'S ALSO BEEN AN

23   AGENT FOR 20 SOME YEARS, LICENSED, THEN SET UP THE BLEASE

24   COMPANY, AND SHE RUNS THE COMPANY.

25         THE PAYMENTS TO GILMAN FOR WHAT HE BOUGHT, WHICH WAS

REALLY THE LIST OF CLIENTS AND ALSO THE EXTENSIVE FILES

WHICH WERE KEPT ON COMPUTER, I THINK THE GOVERNMENT WOULD

CONCEDE MY CLIENT DID -- EVERYTHING HE DID WAS SCANNED IN

THE COMPUTER. ALL THE INFORMATION IN THIS CASE ARE IN MY

CLIENT'S FILES. SO THAT'S WHAT HE GOT. BUT HE HAD TO GO

OUT IN 2008. THE INDICTMENT WAS '05 AND '06, MY GUY

OPERATES IN '07. IN '07, HE HAD TO GET BRAND NEW

CONTRACTS WITH CLIENTS AND THE PAYMENT WAS DERIVED AS A

PERCENTAGE OF COMMISSIONS EARNED. HE DOESN'T HAVE A RIGHT

TO THE COMMISSIONS, HE HAS A RIGHT TO THE METHOD OF

PAYMENT THAT COMES FROM THE COMMISSIONS.

SO BACK TO MY CONVERSATION WITH THE GOVERNMENT.

AFTER I CONFERRED WITH MR. IVEY, I WENT THE EXTRA STEP. I

WAS IN MCDONALD'S OVER IN CAMERON VILLAGE, WHICH I

SHOULDN'T HAVE BEEN THERE, BUT I WAS THERE. I CALLED,

SAID I'M GOING TO TELL THE GOVERNMENT, JUST TO MAKE SURE

THAT THEY KNOW THAT THE ASSET IS NOT MR. STOKES' BUT IT

WAS BLEASE'S. NOW, I CAN'T REMEMBER THE CONVERSATION --

I'M SORRY, IT WAS A VOICE MAIL MESSAGE, BUT I REMEMBER

WHERE IT WAS. I LEFT A MESSAGE, I BELIEVE, CONFIRMING

THAT I DIDN'T THINK STOKES OWNED IT BUT MY FEE WAS COMING

OUT OF IT. THAT WAS FRIDAY, THE 5TH OF DECEMBER.

THE FOLLOWING WEEK, I'M NOT SURE WHAT DAY, BUT I HAD

SPOKEN WITH MR. AYERS DIRECTLY. WE DID DOCUMENT TO

CONFIRM THE TRANSFER. WHAT HAPPENED WAS WHEN HALLMART

SOLD TO GILMAN, GILMAN THEN OWED THE RECEIVABLE BACK TO

HALLMART.  HALLMART THEN IS BOUGHT IN AN ARMS-LENGTH

TRANSACTION BY BLEASE, WHICH WAS SET UP.  SO BLEASE HAS

THE RIGHT TO RECEIVE THE PAYMENTS WHICH ARE GOING TO --

SUPPOSED TO COME IN '08, '09 AND 2010.

    BLEASE THEN ASSIGNS THE RIGHT FOR MY LAW FIRM TO

RECEIVE $250,000 PAYMENT FOR LEGAL FEES.  GILMAN SIGNED A

NOTE, A DOCUMENT, CONFIRMING THAT ARRANGEMENT AND HOW THE

PAYMENTS WERE TO BE MADE ON THE 15TH OF DECEMBER.  THE

FIRST 250, AND THEN THE REMAINDER WOULD BE PAID TO BLEASE.

IT WAS AN ASSIGNMENT OF BLEASE'S RIGHT TO RECEIVE THAT

PAYMENT, AND GILMAN SIGNED IT.

    WHAT HAPPENED WAS THE GOVERNMENT CALLED DOWN -- THE

GOVERNMENT HAS A PROFFER LETTER WITH GILMAN AND THEY HAVE

AN AGREEMENT AND THEY TELL LANCE -- THEY TELL MR. AYERS,

THAT THEY HAVE -- THEY MAY BE INTERESTED IN THIS MONEY AND

NOT TO MAKE THE PAYMENT.  AND MR. AYERS SAYS, WHAT AM I

GOING TO DO, I'M TRYING TO KEEP MY GUY FROM BEING

INDICTED.  I UNDERSTAND THEIR POSITION.  YOU HAVE AN

AGREEMENT AND OBLIGATION TO PAY BLEASE AND NOW THE

GOVERNMENT COMES IN AND SAYS, WE MAY HAVE A CLAIM TO THAT

MONEY.  NOTHING FILED AT THAT TIME, BUT THEY PUT HIM ON

NOTICE.

    MR. AYERS AND I SPOKE.  HE SAID, I THINK WHAT I'LL DO

IS SEND IT IN TO SUPERIOR COURT AND LET YOU-ALL FILE

1    SOMETHING.  THE GOVERNMENT INDICATED IN THE LETTER THEY

2    DIDN'T WANT IT TO HAPPEN, AND I AGREED TO THAT.

3            **THE COURT:**  WHY SEND IT TO THE SUPERIOR COURT?

4            **MR. SHANAHAN:**  THEY WERE GOING TO DEPOSIT THE

5    MONEY.  SOMETIMES LIKE INSURANCE COMPANIES DO, PEOPLE

6    FIGHTING OVER MONEY PUT IT IN SUPERIOR COURT AND WALK

7    AWAY.

8        WHAT HAPPENED WAS, UNBEKNOWNST TO ME, WHEN I

9    TALKED -- WELL, ON DECEMBER 11, JUDGE, THAT WEEK, I GET AN

10   E-MAIL FROM THE GOVERNMENT.  I ACTUALLY HAVE AN E-MAIL

11   CORRESPONDENCE, JUDGE, I THINK IT IS HELPFUL.  MAY I

12   APPROACH?

13           **THE COURT:**  YES.

14           **MR. SHANAHAN:**  SERIES OF THREE E-MAILS, JUDGE.

15   BY WAY OF IDENTIFICATION, THE FIRST ONE IS GOING TO COME

16   ON DECEMBER 11 AT 7:14; THE SECOND ONE IS DECEMBER 16 AT

17   11:00 A.M.; THE THIRD ONE IS ON THE SAME DAY, DECEMBER 16,

18   AT 6:22.  I HAVE YELLOW HIGHLIGHTED BOTH MY COPIES AND THE

19   ONE I SUPPLIED TO THE GOVERNMENT.

20       NOW, STARTING WITH THE DECEMBER 11 AT 7:14 P.M., IF

21   YOU LOOK DOWN -- ACTUALLY THERE'S TWO E-MAILS ON THIS ONE.

22   JOSH HOWARD SENT ME AN E-MAIL REFERRING TO MELISSA, MY

23   NEWEST LAWYER IN OUR FIRM, JUDGE, WHO'S WORKING WITH ME ON

24   THE CASE.

25       THE LAST PARAGRAPH OF HIS E-MAIL FROM 5:46 SAYS:

1   MOST IMPORTANTLY, AND IN LIGHT OF YOUR FOLLOW-UP CALL FROM

2   OUR MOST RECENT MEETING -- THAT'S THE CALL I MADE TO HIM

3   FROM MCDONALD'S DRIVE-THRU WINDOW -- STEVE WEST AND I ARE

4   GOING TO WANT TO TALK WITH YOU ON MONDAY OR TUESDAY ABOUT

5   THE NEXT PAYMENT FROM GILMAN TO THE BLEASE COMPANY.  HAVE

6   YOU GOT CONFERENCE CALL AVAILABILITY ON MONDAY?  MY

7   RESPONSE AT 7:14 THAT NIGHT WAS:  I WILL MAKE TIME.  AND I

8   DID.

9        WHAT HAPPENED WAS, WE HAD A CONVERSATION ON MONDAY,

10  WHICH I THOUGHT WAS GOING TO BE WITH MR. WEST.  IT WAS THE

11  TIME THEY CHOSE AND THE TWO OF US AND I WERE GOING TO

12  TALK.

13              **THE COURT:**  MONDAY, THE 15TH?

14              **MR. SHANAHAN:**  YES.  AND WE DID, IN FACT, CHAT

15  ON MONDAY THE 15TH.  INSTEAD OF MR. WEST, MY GOOD FRIEND

16  FROM WHEN I WORKED UP HERE, HE WAS NOT ON THE PHONE CALL

17  BUT IT WAS JOSH AND TWO AGENTS.  THEY PROCEEDED TO INQUIRE

18  OF ME ABOUT THE TRANSACTION AND THE STATUS.  I FELT I WAS

19  BEING INTERROGATED A LITTLE BIT, BUT I WAS GLAD TO EXPLAIN

20  TO THEM, BECAUSE I THOUGHT WE WERE TALKING ABOUT THE FEE.

21  I WANTED TO EXPLAIN TO THEM IT REALLY WASN'T MY CLIENT'S,

22  I DON'T THINK IT WAS PROCEEDS, IT WAS TWO YEARS LATER AND

23  THEY WERE CONFUSED BY GILMAN WHO, IN GILMAN'S MIND, HE MAY

24  HAVE THOUGHT HE OWED STOKES, IN TERMS OF, I BOUGHT THIS

25  AGENCY, IT BELONGED TO STOKES.

1    THE REPORT OF INTERVIEW WAS CRYPTIC AND NOT ACCURATE.

2  SO I WAS WILLING TO AND DID WALK THEM THROUGH AND

3  EXPLAINED TO THEM, BLEASE, HOW THE TRANSACTION OCCURRED,

4  HOW IT WAS DONE AT ARMS-LENGTH, HOW IT WAS DONE FOR

5  CONSIDERATION.  NEVER DID THEY TELL ME THAT THEY WERE

6  ABOUT TO OR THAT THEY HAD, ON DECEMBER 12, FILED THEIR EX

7  PARTE APPLICATION.

8    SO IN CHRONOLOGICAL ORDER, I DISCLOSED IT, THEY ASKED

9  TO MEET WITH ME, THEY GO TELL GILMAN'S ATTORNEY NOT TO

10  SEND THE MONEY.  THEN THEY TELL ME THEY WANT TO TALK TO ME

11  ABOUT IT.  THEN THEY COME IN EX PARTE AND FILE THEIR

12  APPLICATION AND THEN ON MONDAY THEY ATTEMPT TO GET WHAT,

13  IN EFFECT, IS DISCOVERY FROM ME ABOUT THE TRANSACTION, AND

14  I'M IN GOOD FAITH.

15    I EVEN ASKED THE PROSECUTOR WHETHER HE HAD AUTHORITY

16  TO RESOLVE THE ISSUE IN THE CONVERSATION BECAUSE I THOUGHT

17  WE WERE WORKING OUT SOMETHING ON THIS.  I SAID, I WAS VERY

18  CLEAR FROM THE BEGINNING, I'M VERY CONCERNED ABOUT

19  CONFLICT.  HERE WE ARE TALKING ABOUT SETTLEMENT AND IN THE

20  SAME CONVERSATION WHERE WE'RE TALKING ABOUT MY FEE, WHICH

21  MAKES ME UNCOMFORTABLE, MY FIRM'S FEE, WHICH MAKES ME

22  UNCOMFORTABLE.

23    I REPRESENTED AT THAT TIME THAT BLEASE WAS WILLING TO

24  ALLOW THE 250 TO GO TO MY FIRM SO THAT WE COULD MOVE

25  FORWARD ON THE DEFENSE, AND THAT THE REMAINING AMOUNT OF

MONEY WOULD GO INTO A TRUST ACCOUNT THAT WE COULD AGREE

ON, AND WE WOULD MOVE FORWARD. I WAS ADVISED AT THAT TIME

THE GOVERNMENT WOULD NEVER AGREE TO WHAT THEY DESCRIBE AS

AN EXCESSIVE FEE. THE WORD MIGHT HAVE BEEN A LITTLE MORE

COLORFUL, BUT THEY WOULD NOT AGREE TO THAT WITHOUT A COURT

ORDER.

SO WHAT HAPPENED, JUDGE, I GOT OFF THAT CALL AND WAS

BUSY WITH OTHER THINGS, AS YOU WILL SEE FROM THE NEXT

E-MAIL. THE NEXT DAY, HAVING THOUGHT ABOUT IT, I THOUGHT

THAT THAT CALL JUST LEFT A BAD TASTE IN MY MOUTH. SO I

SAY: HAVING THOUGHT A BIT ABOUT OUR CONVERSATION

YESTERDAY AND THE GOVERNMENT'S RECENT ACTIONS TO IMPEDE MY

CLIENT'S WIFE'S COMPANY FROM COLLECTING MONEY -- I KNEW

AND TOLD THEM I HAD SPOKEN TO AYERS -- AND KNOWING THAT A

PORTION OF THE MONEY IS COMMITTED TO PAYING CARL STOKES'

ATTORNEY'S FEES IN DEFENDING THE INDICTMENT AGAINST HIM,

SURE FEELS LIKE THE GOVERNMENT IS INTERFERING WITH MY

CLIENT'S RIGHT TO LEGAL COUNSEL AND THE ATTORNEY-CLIENT

RELATIONSHIP ITSELF. IF TRUE, THIS COULD POSE A

STRUCTURAL ERROR FOR THE GOVERNMENT IN ITS PROSECUTION.

AS I INDICATED YESTERDAY, I AM KNEE-DEEP IN A BANKRUPTCY

TRIAL SET TO BEGIN TOMORROW, SO I HAVE NO TIME TODAY TO

CONSIDER OR RESEARCH THIS SITUATION, BUT I DON'T WANT MY

WILLINGNESS TO GIVE THE GOVERNMENT A FEW DAYS TO CONSIDER

IF IT'S GOING TO MAKE A CLAIM AGAINST THE NOW OVERDUE

PAYMENT TO BE CONSTRUED AS A WAIVER OF MY CLIENT'S RIGHTS,

ESPECIALLY AS IT RELATES TO HIS RIGHT TO COUNSEL.

AND THE LAST ONE IS REALLY JUST FOR COMPLETION.  WHAT

HAPPENED WAS JOSH DIDN'T RESPOND TO THAT BUT LATER THAT

DAY YOUR ORDER APPARENTLY CAME DOWN.  SO RIGHT AT THE

CLOSE OF BUSINESS, 5:30 OR SO, I GET A CALL FROM HIM.  I

THANKED HIM FOR IT.  I SAID AT THE END:  I WILL RESERVE

FURTHER COMMENT IN VIEW OF OUR CONVERSATION YESTERDAY

UNTIL I CAN REVIEW EVERYTHING, BUT AT A MINIMUM I FEEL

VERY TAKEN ADVANTAGE OF.

MY POINT IN SHARING ALL OF THIS, JUDGE, IS THAT I

BELIEVE THAT THE MOTIVATION FOR THE FILING OF THE

APPLICATION AND THE WAY IN WHICH IT UNRAVELED IS WHAT

WE'RE REALLY HERE ABOUT TODAY, IS NOT ASKING THAT MONEYS

BE HELD IN CASE FORFEITURE OCCURS BUT TRYING TO CUT OFF MY

CLIENT'S ABILITY TO HAVE COUNSEL REPRESENTING HIM.

NOW, THE GOVERNMENT CONTENDS, JUDGE, IN ITS

APPLICATION, OR IN THE MEMORANDUM -- EXCUSE ME -- IN

SUPPORT.

**THE COURT:**  THE MEMORANDUM FROM YESTERDAY OR THE

FIRST MEMORANDUM?

**MR. SHANAHAN:**  THE MEMORANDUM FROM THE 18TH,

JUDGE.  THEY BEGIN WITH THE BILMAN CASE, WHICH I PRESUME

THE COURT IS FAMILIAR WITH, IT'S A 1990 CASE.  THEY ARE

SAYING, WE'VE GOT -- I'M SURE THE POWER POINT WILL SAY THE

1 SAME THING -- WE HAVE AN INDICTMENT AND THEREFORE, BECAUSE

2 WE HAVE AN INDICTMENT, THAT'S PROBABLE CAUSE AND WE DON'T

3 NEED TO DO ANYTHING ELSE TO TIE UP THE MONEY.

4 WHAT THEY DON'T TELL YOU IS THAT BILMAN HAS BEEN

5 UNIVERSALLY REJECTED IN ALMOST EVERY OTHER CIRCUIT, HAS

6 BEEN CRITICIZED BY OTHER DISTRICT COURT JUDGES IN THIS

7 CIRCUIT.  BUT MORE IMPORTANTLY THAN THAT, WHAT THEY DIDN'T

8 BRING TO YOUR ATTENTION OR DISCLOSE IS THE LOMBARDI VERSUS

9 UNITED STATES CASE, WHICH IS A 4TH CIRCUIT CASE FROM 1995.

10 IN THAT CASE, AND I HAVE COPIES OF IT IF THE COURT

11 WANTS IT AND COPIES FOR THE GOVERNMENT.  I'M SURE THEY ARE

12 AWARE OF IT.  LOMBARDI ADDRESSES THE ISSUE OF WHETHER OR

13 NOT, IN CONTEXT OF A RULE 11, WHETHER OR NOT A CLIENT HAD

14 TO BE ADVISED OF HIS RIGHTS AT A RULE 11 WITH REGARD TO

15 ASSET FORFEITURE.  IN THAT CASE, THE COURT SAID,

16 FORFEITURE IS A SENTENCING MATTER, IT'S NOT PART OF A

17 CHARGE ITSELF, AND THAT'S WHY IN THIS INDICTMENT THEY

18 WON'T CALL NOTICE.

19 SO THE UNITED STATES DEPARTMENT OF JUSTICE HAS TAKEN

20 A POLICY POSITION WHICH SAYS THAT YOU DON'T CHARGE THE

21 GRAND JURY ON FORFEITURE BECAUSE IT'S NOT PART OF THE

22 CHARGE, IT'S PART OF SENTENCING.  THEREFORE, JUDGE, IF

23 THEY'RE CONTENDING THAT THERE WAS PROBABLE CAUSE ON THE

24 FORFEITURE ASPECT, THEY SHOULD HAVE CHARGED THE GRAND

25 JURY.  AND IF THEY DID, A, I WANT TO SEE IT.  B, IF THEY

1    DID DO IT, THEN THEY ARE IN VIOLATION OF DEPARTMENT OF

2    JUSTICE POLICY.  MY POINT BEING, THEY CAN'T SIMPLY RELY ON

3    SAYING THEY HAVE PROBABLE CAUSE ON THE ASSET FORFEITURE

4    ASPECT OF THE CASE, BECAUSE IT WOULDN'T HAVE BEEN OR

5    SHOULDN'T HAVE BEEN PRESENTED TO THE GRAND JURY.  THE

6    PROGENY OF CASES THAT FOLLOWED LOMBARDI, I THINK, SUPPORT

7    THAT POSITION, JUDGE.

8         **THE COURT:**  DO YOU THINK A VIOLATION OF A U. S.

9    ATTORNEY'S MANUAL CREATES SOME RIGHTS IN YOUR CLIENT,

10   ASSUMING THERE IS SUCH A VIOLATION?

11        **MR. SHANAHAN:**  WELL, I WOULD SAY, JUDGE, THAT I

12   DON'T KNOW WHETHER OR NOT THEY CHARGED -- WHAT I'M

13   SUGGESTING IS, I DON'T BELIEVE THAT JOSH HOWARD

14   REPRESENTED -- WOULD VIOLATE DOJ POLICY.  ASSUMING THEY

15   DIDN'T VIOLATE THE POLICY, THE GRAND JURY WOULD NOT HAVE

16   BEEN GIVEN THE CHARGE OR INSTRUCTION ON THE ASSET

17   FORFEITURE PART AND THEREFORE YOU CAN'T RELY AND SAY, I

18   HAVE PROBABLE CAUSE ON THE ASSET FORFEITURE ASPECT OF THE

19   CASE UNDER BILMAN.

20        **THE COURT:**  YOUR POSITION WOULD BE I COULDN'T

21   RELY ON THE INDICTMENT, BUT THEY ALSO HAVE AN AFFIDAVIT

22   FROM AN AGENT, RIGHT?  IT'S NOT THEIR ONLY EVIDENCE,

23   RIGHT?  TO THE EXTENT THAT THEY'RE RELYING ON THE

24   INDICTMENT, THEY ALSO SUBMITTED AN AFFIDAVIT FROM AN

25   AGENT.

1      **MR. SHANAHAN:** YES. I WOULD SAY OKAY, AND NOW,

2    THEY DID SUBMIT AN AFFIDAVIT AND THE AFFIDAVIT TALKS ABOUT

3    NOTHING MORE THAN WHAT'S IN THE INDICTMENT. THEY GO BACK,

4    SAY WE RAIDED THEM IN '06, WE HAVE THIS INFORMATION, YADA,

5    YADA, YADA. HERE'S THE PROBLEM. THEY ASK -- YOUR FIRST

6    QUESTION IS, WHO HAS THE MONEY? GILMAN HAS THE MONEY. SO

7    THEY ARE COMING IN, NOT TRYING TO RESTRAIN MR. STOKES'

8    MONEY BUT A THIRD PARTY, AND THE THIRD PARTY IS TO PAY THE

9    MONEY TO YET A FOURTH PARTY.

10        THEIR INDICTMENT, AND THEY HAVE A FOOTNOTE IN HERE

11    THAT SOMEHOW SAYS, WELL, THE BLEASE COMPANY IS A SHAM. NO

12    EVIDENCE IN THEIR AFFIDAVIT ABOUT THAT. ALSO, WHAT ABOUT

13    THE TRANSACTION TO GILMAN? WAS IT FOR VALUE AND

14    CONSIDERATION? WHERE'S THE EVIDENCE ON THAT? THEIR

15    AFFIDAVIT DOESN'T SPEAK TO EITHER OF THOSE ISSUES. THEY

16    JUST DROP IT IN A FOOTNOTE, SAY IT'S HIS WIFE AND

17    THEREFORE IT MUST BE A SHAM.

18        THE FACT SHE WORKED IN THE COMPANY AND HAS HER OWN

19    LICENSE AND THE WHOLE ARRANGEMENT WAS BLESSED BY THE STATE

20    OF NORTH CAROLINA WHEN THEY CAME AFTER HIS LICENSE. NONE

21    OF THAT IS ADDRESSED IN THERE.

22        THEY THEN SORT OF, IN PARAGRAPH THREE ON PAGE 11, GET

23    AROUND TO AT LEAST TRYING TO TAKE AN END RUN AT THE ISSUE,

24    WHAT I THINK THIS IS ALL ABOUT, AND THAT IS TO TRY AND

25    PREVENT MY CLIENT FROM HAVING COUNSEL OF HIS CHOICE.

1    I'M NOT SURE WHETHER THIS IS THE TIME TO DO IT,

2    JUDGE, BUT I DO HAVE AN AFFIDAVIT OF MR. STOKES WHICH I DO

3    THINK -- AND MRS. STOKES.  THE AFFIDAVIT OF MR. STOKES

4    ESSENTIALLY PROVIDES THAT HE DOES NOT, OTHER THAN THIS --

5    I'LL TENDER THE ORIGINAL TO THE COURT AND A COPY FOR THE

6    JUDGE.

7    ESSENTIALLY THE AFFIDAVIT REPRESENTS THAT HE NEEDS

8    THIS MONEY TO HAVE HIS COUNSEL OF CHOICE, WHICH IS MY LAW

9    FIRM.  PARAGRAPH FIVE, I TRY AND ADDRESS OR AT LEAST

10   RESPOND SOMEWHAT TO THE ONLY SHOWING THAT THE GOVERNMENT

11   MAKES.  THEY RAISE THIS ISSUE AND THEY ANTICIPATE A JONES

12   FARMER TYPE ARRANGEMENT.  AND THEY SAY OH, HE'S GOT THE

13   ABILITY TO MAKE HIS PAYMENTS BECAUSE HE HAS A HOME.  THEY

14   FAILED TO MENTION HIS WIFE OWNS IT JOINTLY WITH HIM AND

15   SPOUSE HAS NO DUTY TO MAKE THE SUPPORT.  THEY ALSO FAIL TO

16   MENTION THERE'S A MORTGAGE OVER $565,000 AGAINST HIM.

17   THE HALLMART BUILDING, THEY SAY, HAS A RECENT TAX

18   VALUE OF 277.  FAILURE TO MENTION $78,000 MORTGAGE OR THAT

19   IT IS JOINTLY OWNED BY HE AND HIS WIFE.  FINALLY, HIS

20   BEACH PROPERTY, WHICH IS JUST A LOT, WHICH IS OWNED

21   JOINTLY BY HIS WIFE.

22   SO THEY THEN GO ON AT SOME LENGTH TO TALK ABOUT HIS

23   WIFE STANDS TO INHERIT A FORTUNE.  THAT'S PRETTY

24   SENSATIONAL, JUDGE.  I DON'T KNOW WHAT A FORTUNE IS THESE

25   DAYS.  I KNOW A LOT OF PEOPLE LOST A FORTUNE RECENTLY IN

1 THE MARKET.  THEY TALK ABOUT THINGS THAT ARE INACCURATE

2 REGARDING MY CLIENT'S WIFE'S MOTHER'S ESTATE, WHICH

3 CERTAINLY ISN'T OF ANY PROBATIVE INTEREST, I WOULDN'T

4 THINK, TO THE COURT IN THE ISSUES BEFORE US.

5     SO TO COME CIRCLE TO ANSWER YOUR QUESTION ABOUT, DOES

6 MY CLIENT HAVE STANDING, MY CLIENT HAS STANDING BECAUSE

7 HIS CLAIM IS THE $250,000 PORTION OF THE APPROXIMATE

8 $350,000 PAYMENT WHICH IS NOW --

9     **THE COURT:**  HOW DOES HE STILL HAVE A CLAIM ABOUT

10 THAT IF IT'S BEEN ASSIGNED?

11     **MR. SHANAHAN:**  HE DOESN'T HAVE A CLAIM, HE HAS

12 STANDING.  THE ISSUE IS, DOES HE HAVE STANDING.

13     **THE COURT:**  I KNOW, BUT GOING -- I MEAN, IT'S

14 BECAUSE THE PAYMENT IS BEING MADE ON BEHALF OF -- FOR HIS

15 BENEFIT SO THAT HE CAN RETAIN YOUR LAW FIRM?

16     **MR. SHANAHAN:**  YES.  HE'S GOING OUT TO GET A

17 LOAN TO BE ABLE TO DEFEND HIMSELF, WHICH WOULD BE SOME

18 EVIDENCE HE DOESN'T HAVE THE MONEY HIMSELF, I WOULD THINK,

19 JUDGE.  AND NOW THE GOVERNMENT, BEFORE THE LOAN

20 TRANSACTION CAN BE COMPLETED, HAS GONE TO THAT THIRD PARTY

21 AND SAID, DON'T MAKE THE PAYMENT.  WHILE IT'S ALLEGEDLY

22 NEGOTIATED WITH ME, COME INTO COURT EX PARTE TO TRY AND

23 TIE THE MONEY UP.  IT HAS NO SHOWING AND CAN MAKE NO

24 SHOWING AS TO WHAT THE HISTORY -- WHAT'S THEIR SHOWING,

25 JUDGE, THAT THE PAYMENT FROM THAT -- THE SALE TO THE

GILMAN AGENCY WAS NOT ARMS-LENGTH, AND THAT THEY HAVE A
CLAIM BACK?  ESPECIALLY WHEN GILMAN HAD TO GO OUT, IF YOU
UNDERSTAND THE NATURE OF THE INSURANCE BUSINESS, EVERY
YEAR AND GET NEW CONTRACTS WITH HIS CLIENTS AND THE MONEY
COMES IN IN '08, UNRELATED; MY CLIENT HAD NO INVOLVEMENT
IN IT.  '08 MONEY, WHEN THEY ARE CLAIMING '05, '06.  THEY
HAD NO SHOWING IN ANY OF THE MATERIALS.

SECONDLY, WHAT'S THEIR SHOWING THAT THE HALLMART'S
SALE TO BLEASE WAS A SHAM, AS THEY CONTEND?  I ADVISED
THEM IT WAS AN ARMS-LENGTH TRANSACTION FOR CONSIDERATION.
HOW'S IT STRUCTURED?  I SAID THEIR ACCOUNTANT THEN WORKED
OUT THE STRUCTURAL.  AND SO MY QUESTION IS, WHERE'S THEIR
EVIDENCE THAT IT'S A SHAM?

SO THOSE TWO QUESTIONS ALONE AND HOW ABOUT THE
ASSIGNMENT ULTIMATELY FROM BLEASE OF THE FIRST 250,000 TO
MY FIRM TO MAKE THE PAYMENT.  ON THE RECORD BEFORE YOU,
THEY HAVE NO EVIDENCE, ZERO EVIDENCE THAT ANYTHING ABOUT
THAT TRANSACTION IS SUSPECT IN ANY WAY.  AND FOR THEM TO
SUGGEST THAT THE COURT CAN GO TO A THIRD PARTY CREDITOR
AND SAY DON'T MAKE THE PAYMENT, I THINK WOULD BE A TOTAL
MISCHARACTER OF JUSTICE.

**THE COURT:**  GOING BACK AGAIN, JUST SO THAT I GET
A SENSE, AND I'M GOING TO TAKE SOME EVIDENCE, BUT IT'S
HALLMART AND GILMAN, THEY HAVE AN AGREEMENT AND GILMAN
THEN OWES HALLMART THESE PAYMENTS.  HALLMART THEN MAKES

1    SOME KIND -- ENTERS SOME KIND OF AGREEMENT WITH BLEASE.

2          **MR. SHANAHAN:**  HALLMART THEN -- RIGHT, SELLS THE

3    BUSINESS TO BLEASE.

4          **THE COURT:**  OKAY.  SELLS THE BUSINESS TO BLEASE.

5    SO BLEASE THEN PRESUMABLY NOTIFIES GILMAN, HEY WE'VE

6    BOUGHT HALLMART AND WHAT, GILMAN, YOU OWED TO HALLMART,

7    YOU NOW OWE TO BLEASE.

8          **MR. SHANAHAN:**  EXACTLY.

9          **THE COURT:**  OKAY.  AND THEN --

10          **MR. SHANAHAN:**  AND SO -- AND HALLMART, I'M

11    SORRY, GILMAN INSURANCE AGENCY ACKNOWLEDGED THE ASSIGNMENT

12    AND SPECIFICALLY ACKNOWLEDGED AND AGREE -- WHAT HAPPENS IS

13    THESE COMMISSIONS OR THE PAYMENTS, JUDGE, AND KNOWING

14    EXACTLY WHAT THEY ARE SINCE THEY ARE BASED ON COMMISSIONS

15    FROM '08, THEY COME IN A LITTLE SPORADICALLY.  THE

16    AGREEMENT WAS THE FIRST 250,000, WHICH IS ALREADY IN

17    GILMAN'S ACCOUNT --

18          **THE COURT:**  SO GILMAN ACKNOWLEDGES THE

19    ASSIGNMENT AND THEN BLEASE NOTIFIES GILMAN HEY, WE KNOW

20    YOU OWE US 350, WE WANT YOU TO PAY 250 TO THE SHANAHAN LAW

21    FIRM AND WE WANT YOU TO PAY 100, BALLPARK OR WHATEVER,

22    ROUND NUMBERS, TO BLEASE, AND THIS IS AS TO THE PAYMENT

23    THAT WAS OTHERWISE DUE ON DECEMBER 15.

24          **MR. SHANAHAN:**  YES, SIR.  JUDGE, WE WOULD JUST

25    POINT OUT, AS PART OF THIS CONVERSATION WHY I THINK THE

1  REAL ISSUE REVOLVES AROUND THE PAYMENT TO THE FIRM, IS

2  THAT UNDER UNITED STATES VERSUS GONZALES-LOPEZ, 2006 CASE

3  FROM THE SUPREME COURT, THAT STRUCTURAL ERROR, IF THERE'S

4  BEEN A WRONGFUL FORFEITURE OF MONEY WHICH DENIES THE

5  CLIENT HIS RIGHT TO COUNSEL, THAT THAT IS A STRUCTURAL

6  ERROR THAT WOULD REQUIRE, AT A MINIMUM, THE RETRIAL OF THE

7  CASE.  SO IF YOU TAKE THIS MONEY NOW, THIS IS REALLY --

8  REALLY IS WHAT'S COME TO BE KNOWN AS THE GONZALES-LOPEZ

9  ISSUE.  THE CLIENT COMES IN, SAYS THE GOVERNMENT WANTS

10  MONEY.  THE DEFENDANT SAYS, I NEED THE MONEY TO DEFEND

11  MYSELF.  IF HE DOESN'T GET IT AND TRIES THE CASE, GOES UP

12  ON APPEAL, THEY SAY, HE COULDN'T DEFEND HIMSELF BECAUSE HE

13  LOST THE RIGHT OF COUNSEL OF HIS CHOICE THAT HE COULD PAY,

14  AND I HAVE BEEN REPRESENTING HIM FOR OVER TWO YEARS, THEN

15  THAT'S A STRUCTURAL ERROR.  YOU DON'T REVIEW IT ON APPEAL

16  AND YOU HAVE TO GO BACK AND RETRY THE CASE.

17       AND SO IT IS THE COURTS, I THINK, UNDER THE

18  GONZALES-LOPEZ CASE AND ITS PROGENY, IS A REAL PROBLEM.

19  THAT'S INTUITIVELY, YOU KNOW, MY STREAM OF CONSCIOUSNESS

20  SAID THERE WAS A PROBLEM WITH WHAT WAS GOING ON HERE, AND

21  NOW I HAVE HAD A LITTLE MORE TIME TO THINK ABOUT IT, I

22  THINK THE REAL PROBLEM HERE IS IF YOU TIE THIS MONEY UP,

23  IT WILL CREATE A GONZALES-LOPEZ ISSUE.

24       I THINK THEY HAVE SO MANY HURDLES TO JUMP THROUGH.

25  WHERE'S GILMAN?  HOW COME HE'S NOT HERE?  MY QUESTION IS,

```
1    IT'S THEIR MONEY THEY ARE TRYING TO TIE UP.  I THINK THEY
2    DON'T HAVE THE RIGHT PARTIES HERE, THEY HAVEN'T CONNECTED
3    ALL OF THESE DOTS.  THEY HAVEN'T MADE ANY ATTEMPT TO --
4    THEY RAN TO THE COURTHOUSE IN SECRET TO TRY TO GET AN
5    ORDER TO HAVE THE MONEY TIED UP.  IT'S NOW OBVIOUSLY A
6    DISTRACTION TO MY ABILITY TO BE ABLE TO REPRESENT MY
7    CLIENT EFFECTIVELY.
8        I THINK THEY HAVE FAILED TO MAKE THEIR SHOWING IN THE
9    PLEADINGS, WHICH THEY SAID THEY WOULD REST ON.  NO
10   EVIDENCE OF A SHAM TRANSACTION.  THERE'S TWO MAIN
11   TRANSACTIONS AND THEN OBVIOUSLY MY FIRM WOULD ONLY STAND
12   IN THE SHOES OF BLEASE.  BUT THEY HAVE NO EVIDENCE THAT
13   EITHER OF THEM WERE SHAM TRANSACTIONS.  THEY SAID TODAY
14   THEY THOUGHT IT WAS DIRECT.
15       I HEARD REPRESENTATION, SUBSTITUTE AND DIRECT.  IT
16   CAN'T BE DIRECT MONEY BECAUSE THE MONEY THAT THEY ARE
17   TALKING ABOUT WAS DERIVED IN THE YEAR 2008 AS A RESULT OF
18   CONTRACTS THAT HAVE BEEN ENTERED INTO IN 2008.  THE 2007
19   YEAR IS NOT INVOLVED.
20       THERE'S SOME REPRESENTATION IN HERE ABOUT 2007
21   PAYMENTS, BUT WHAT HAPPENED WAS THIS DEAL DIDN'T GO DOWN
22   UNTIL 2007.  THE HALLMART AGENCY HAD ALREADY EARNED THOSE
23   PAYMENTS.  SO EACH YEAR IN THE INSURANCE INDUSTRY IS A
24   BRAND NEW YEAR.  FEBRUARY 28, UNDER THIS KIND OF
25   INSURANCE, THESE CONTRACTS HAVE TO BE SIGNED.  EVERY YEAR
```

1   YOU HAVE TO SIGN THEM UP.  IT'S NOT TAINTED.  WE'RE TWO

2   YEARS DOWN THE ROAD.  THE ONLY REASON THERE'S EVEN A

3   REFERENCE TO COMMISSIONS, IS IT'S THE MEASURING STICK BY

4   WHICH THE MONEY IS PAID.

5       SO ABSENT THAT SHOWING, THERE SHOULD BE NO -- THE

6   GOVERNMENT SHOULD NOT -- THE COURT SHOULD NOT ENTER AN

7   ORDER RESTRAINING GILMAN FROM MAKING THE PAYMENTS.

8           **THE COURT:**  THANK YOU.  ALL RIGHT, MR. HOWARD,

9   DID YOU WANT TO RESPOND BY WAY OF ARGUMENT OR PRESENT

10  EVIDENCE?  WHAT WOULD YOU LIKE TO DO?

11          **MR. HOWARD:**  YOUR HONOR, THANK YOU.  I WOULD

12  LIKE TO RESPOND TO A FEW POINTS, PARTICULARLY STRUCTURAL

13  ERROR.  I HAVE CASES FOR THE COURT, INCLUDING UNITED

14  STATES VERSUS WINGERTER.  IT'S A 4TH CIRCUIT DECISION OF

15  2005.  IF I MAY APPROACH AND HAND THAT UP?

16          **THE COURT:**  YES.

17          **MR. HOWARD:**  IT MAKES VERY CLEAR THAT THE 4TH

18  CIRCUIT ALLOWS THE PRETRIAL RESTRAINT OF SUBSTITUTE

19  ASSETS.  IT IS, AS MR. SHANAHAN HAS POINTED OUT, THE ONLY

20  CIRCUIT THAT DOES THAT BUT THAT IS THE LAW IN THIS

21  CIRCUIT.

22      SECONDLY, YOUR HONOR, IF YOU WILL TURN TO PAGE NINE

23  OF THAT DECISION, YOUR HONOR, IT IS UNDER HEADNOTE TWO ON

24  THE RIGHT SIDE OF THE PAGE:  IT'S WELL-SETTLED THAT

25  PRETRIAL RESTRAINT OF PROPERTY WHEN THERE'S PROBABLE CAUSE

1   TO BELIEVE IT WILL BE SUBJECT TO FORFEITURE DOES NOT

2   VIOLATE A DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL,

3   EVEN IF THE RESTRAIN OF THOSE FUNDS MAKES IT IMPOSSIBLE

4   FOR HIM TO PAY AND TO RETAIN HIS CHOSEN LAWYER.

5       YOUR HONOR, PART OF THAT PHRASING "CHOSEN" IS VERY

6   IMPORTANT.  MR. SHANAHAN HAS POINTED OUT ALREADY HE DIDN'T

7   KNOW WHAT A FORTUNE IS ANYMORE.  I SUSPECT I DO, AND I

8   THINK A QUARTER OF A MILLION DOLLAR FEE IS SUCH A FORTUNE.

9       IF I COULD APPROACH, I WOULD ALSO LIKE TO HAND UP, IN

10  RE:  RESTRAINT OF BOWMAN GASKINS FINANCIAL GROUP.  THAT IS

11  ANOTHER DECISION OF THE EASTERN DISTRICT OF VIRGINIA

12  FOLLOWING THIS CIRCUIT'S LAW.  YOU CAN SEE IN THE

13  HEADNOTES JUST BELOW JUDGE ELLIS' NAME:  PRE-INDICTMENT

14  RESTRAINT DID NOT ABRIDGE TARGETED INDIVIDUAL'S 6TH

15  AMENDMENT RIGHT TO COUNSEL.

16      YOUR HONOR, THAT'S PRE-INDICTMENT.  THAT'S AN EVEN

17  HARDER BRIDGE TO CROSS, AND THE LAW PROVIDES FOR IT.

18  THERE'S NO STRUCTURAL ERROR HERE.

19      IF YOU WILL TURN TO PAGE 15, THE SUBSTANCE OF THAT IS

20  ANALYZED.  THERE, FAMILY MEMBERS HAD OBJECTED, MUCH AS IS

21  GOING ON HERE.  MOVANT'S FINAL ARGUMENT IS THAT, HEADNOTE

22  FOUR ON THE RIGHT SIDE, IS THAT RESTRAINT OF THESE FUNDS

23  DEPRIVES A OF HIS 6TH AMENDMENT RIGHT TO COUNSEL, AND

24  THAT'S THE UNINDICTED TARGET, AND HIS FAMILY INTEND TO USE

25  BOWMAN ACCOUNT FUNDS TO FINANCE A'S DEFENSE.

1    IT GOES DOWN TO POINT OUT, SUPREME COURT PRECEDENT

2    AND PRETRIAL RESTRAINT OF FORFEITABLE ASSETS DOES NOT

3    ABRIDGE THE 6TH AMENDMENT RIGHT TO COUNSEL.  YOUR HONOR,

4    THERE'S NO STRUCTURAL ERROR HERE BECAUSE THE 6TH AMENDMENT

5    RIGHT TO COUNSEL IS A QUALIFIED RIGHT.  AN INDIGENT MAN

6    CANNOT DEMAND A QUARTER OF A MILLION DOLLAR LAWYER.

7    FURTHERMORE, STRUCTURALLY THIS PROCEEDING, UNDER THE

8    STATUTE, BEGINS WITH OR SETS OUT A SPECIFIC ORDER OF

9    EVENTS, AND THIS DEFENDANT HAS TO SHOW THAT HE HAS NO

10   OTHER ASSETS WITH WHICH TO HIRE A LAWYER.  THERE'S NOT A

11   GONZALES-LOPEZ PROBLEM HERE BECAUSE WE'RE NOT AT TRIAL

12   YET.  HE'S NOT GOING TO TRIAL WITHOUT A LAWYER.  WE'LL GET

13   HIM A LAWYER.

14   YOUR HONOR, OUR CONVERSATIONS THAT MR. SHANAHAN HAS

15   BROUGHT UP, WE'RE INDEED TRYING TO SEE WHAT WE CAN DO TO

16   MOVE THIS CASE ALONG, BECAUSE WE HAVE HAD VERY CORDIAL

17   RELATIONS FOR OVER TWO YEARS OF INVESTIGATION HERE.  IF

18   THE AMOUNT OF MONEY WEREN'T SO REMARKABLE TO ME, WE MAYBE

19   WOULD HAVE GOTTEN FURTHER ALONG WITH THAT.

20   YOUR HONOR, I HAVE DONE THIS NOW FOR ALMOST NINE

21   YEARS.  I'VE ONLY HAD ONE CASE WHERE A DEFENSE ATTORNEY

22   WOULD HAVE GOTTEN THAT MUCH MONEY.  THAT WAS WHEN I WAS AT

23   THE INDEPENDENT COUNSEL'S OFFICE AND THE SUBJECT WAS THE

24   PRESIDENT OF THE UNITED STATES.  THAT'S A BREATHTAKING

25   AMOUNT OF MONEY, AND THIS DEFENDANT'S CLAIM THAT A QUARTER

1    OF A MILLION DOLLARS IS NECESSARY TO FUND THIS DEFENSE IS

2    OUTRAGEOUS.

3         SECONDLY, YOUR HONOR, WE STILL DON'T SEE, WITHOUT ANY

4    LAW OR PRECEDENT FROM THE DEFENSE, WHAT AN ANTICIPATED

5    LOAN FROM HIS SPOUSE WOULD DO TO CREATE STANDING FOR HIM.

6         FINALLY, YOUR HONOR -- WELL, LET ME MOVE TO ANOTHER

7    POINT.  THAT'S NOT THE FINAL POINT.  WE HAVE NOTED IN THE

8    BRIEFS THE DEFENDANT'S WIFE STANDS TO INHERIT FUNDS.

9    JUDGE, WHAT THAT SHOWS YOU, AND THE REASON THAT'S

10   RELEVANT, IS THAT THEY HAVE OTHER RESOURCES.  IF SHE IS

11   WILLING TO LOAN HIM THE MONEY OF THESE PAYMENTS FROM LANCE

12   GILMAN, SHE OUGHT TO BE WILLING TO LOAN HIM THE PROCEEDS

13   OF THE ESTATE, WHICH IS ABSOLUTELY UNTAINTED AND HAS

14   NOTHING TO DO WITH CARL STOKES, BY ANYONE'S ACCOUNT.

15        THE DEFENDANT HAS ALSO RAISED QUESTIONS ABOUT WHY A

16   THIRD PARTY -- HOW CAN WE RESTRAIN THE ASSETS OF A THIRD

17   PARTY BEFORE THEY'RE PAID OUT.  I HAVE LAW ON THAT, TOO.

18   YOUR HONOR, IT'S UNITED STATES VERSUS KIRSCHENBAUM, A 7TH

19   CIRCUIT CASE:  THIRD PARTIES MAY BE RESTRAINED TO PRESERVE

20   THE GOVERNMENT'S INTEREST WHERE THE COURT HELD THE

21   PROPERTY IN THE NAME OF THE DEFENDANT'S WIFE, AFTER

22   FINDING THE DEFENDANT WAS THE TRUE OWNER.

23        YOUR HONOR, THAT'S ON PAGE 795 OF THE WESTLAW

24   PRINT-OUT.

25        AND FINALLY, YOUR HONOR, I JUST WANT TO ADDRESS THE

1  ONE POINT OF THE SERIES OF E-MAILS.  WHAT HAPPENED HERE,

2  AND THESE E-MAILS, I WOULD STRESS, ARE AFTER WE FILED OUR

3  EX PARTE UNDER SEAL APPLICATION WITH THE COURT.  WE FILED

4  FRIDAY.  WE HAD HOPED THAT WE COULD GET IT SOONER THAN WE

5  DID.  WE THOUGHT WE WOULD HAVE IT MONDAY BY THE TIME WE

6  SPOKE WITH MR. SHANAHAN.

7       AS A RESULT, WE COULDN'T TELL HIM ABOUT AN EX PARTE

8  UNDER SEAL APPLICATION, WHICH IS UNFORTUNATE, BUT IT WAS

9  IN PROCESS.  I HAD HOPED THAT WE COULD EXPLAIN TO HIM AT

10  THAT TIME, AS WE DID ON THE PHONE AT THAT TIME, EXPLAIN TO

11  HIM THE PROCESS OF THE JONES-FARMER HEARING AND WHAT WE

12  WOULD DO, SECURE THE ASSETS AND GIVE THEM AN OPPORTUNITY

13  OR A VEHICLE TO CHALLENGE IT, IF NECESSARY.

14       AGAIN, YOUR HONOR, ALL WE WERE TRYING TO DO THEN AND

15  ALL WE ARE TRYING TO DO NOW, IS TO GET THE COURT TO SECURE

16  THE ASSETS SO THAT THEY CAN'T BE FRITTERED AWAY OR PAID TO

17  OTHER PURPOSES.  AND IN THIS CASE, STOPPING THEM FROM

18  BEING PAID TO THE ATTORNEY IS NO 6TH AMENDMENT ERROR, AS

19  THE CASES I HANDED UP SHOW.  THOSE CASES ALSO SHOW THAT

20  SPECIFICALLY BECAUSE WE KNEW THE INTENDED PURPOSE IS MORE

21  BASIS TO KNOW WE HAD TO MOVE URGENTLY.

22       YOUR HONOR, WITH THAT, WE'RE AVAILABLE TO YOU FOR

23  YOUR QUESTIONS.

24            **THE COURT:**  WHAT DO YOU HAVE TO SAY TO THE

25  ARGUMENT THAT -- IS THERE ANYTHING IN THE RECORD ABOUT THE

```
1   TRANSACTION BETWEEN BLEASE AND HALLMART?  IS THAT
2   TRANSACTION DOCUMENT PART OF THE RECORD?
3          MR. HOWARD:  WE HAVE IT HERE AND I CAN PULL THAT
4   UP FOR A POWER POINT.  JUST TO MAKE SURE THE CHRONOLOGY OF
5   THE EVENTS, BECAUSE I KNOW ALL OF US HAVE LIVED WITH THIS
6   CASE FOR SO LONG, WE SOMETIMES CAN TALK PAST IT.  SO I'LL
7   PULL UP THAT TIMELINE.
8          THE INITIAL EVENT, YOUR HONOR, ON THE LEFT SIDE OF
9   THE SCREEN, WAS IN NOVEMBER OF 2006, WHEN FEDERAL AGENTS
10  SEARCHED A NUMBER OF LOCATIONS IN WILSON, INCLUDING THE
11  DEFENDANT'S HOME, WHICH IS THERE ON THE TOP LEFT.  THAT
12  HOME IS ALSO NOW THE CORPORATE OFFICES REGISTERED WITH THE
13  STATE FOR THE BLEASE CORPORATION.
14         YOUR HONOR, THE HALLMART AGENCY ITSELF OR THE
15  PHYSICAL LOCATION OF IT IS THE BOTTOM RIGHT.  THAT'S THE
16  DEFENDANT'S BUILDING.
17         NOW, YOUR HONOR, LATER ON IN AUGUST, THE USDA
18  ADMINISTRATIVE WING, THE RISK MANAGEMENT AGENCY, UPHELD
19  THEIR ADMINISTRATIVE SUSPENSION OF HIS CROP INSURANCE
20  AUTHORITY.
21         THE COURT:  IS THAT LIKE A BAR LICENSE THAT
22  ATTACHES TO HIM; IS THAT HOW THAT WORKS?
23         MR. HOWARD:  CORRECT, YOUR HONOR.  SO AT THAT
24  POINT THEY HAD HAD EFFECTIVELY QUASI JUDICIAL PROCEEDINGS
25  TO REVOKE HIS LICENSE ON THE BASIS OF HIS CONDUCT.
```

1    NOW WE'LL MOVE ON.  JUST THREE WEEKS LATER -- ALL OF

2    THIS, BY THE WAY, IS IN THE PLEADINGS BEFORE THE COURT.

3    BLEASE WAS FORMED ON 13 SEPTEMBER.  THEN EIGHT DAYS LATER,

4    HALLMART SELLS ITS ASSETS IN THIS CROP INSURANCE BUSINESS

5    TO LANCE GILMAN.

6        YOUR HONOR, CROP INSURANCE CONTRACTS AUTOMATICALLY

7    RENEW, UNLESS YOU CANCEL THEM.  SO MR. GILMAN'S BOOK OF

8    BUSINESS THAT HE BOUGHT FROM MR. STOKES IS DIRECTLY

9    FORFEITABLE BECAUSE THIS COMPANY IS THE ONE THAT THIS

10   DEFENDANT USED TO EXECUTE THIS FRAUD.  HE THEN SOLD THAT

11   COMPANY AND THE PROCEEDS OF THAT SALE ARE THE PROCEEDS OF

12   THE FRAUD.

13       NOW, 21 SEPTEMBER, HALLMART CROSSED THE SALES ASSETS

14   TO GILMAN AND THREE DAYS LATER CARL IS STILL ACTING AS

15   PRESIDENT --

16       **THE COURT:**  YOUR ARGUMENT REALLY -- IS YOUR

17   ARGUMENT REALLY THAT IT'S SUBSTITUTE?  I MEAN, MR.

18   SHANAHAN -- AGAIN, YOU-ALL HAVE DEALT WITH THIS CASE

19   LONGER THAN I HAVE -- ARGUED THAT THE TRANSACTIONS AT

20   ISSUE IN THE INDICTMENT DEALT WITH 2005 AND 2006, BUT YOUR

21   POINT WOULD BE IT DOESN'T MATTER, IT'S SUBSTITUTE.

22       **MR. HOWARD:**  THAT IS ALSO A POINT BUT, YOUR

23   HONOR, IT'S ALSO DIRECT BECAUSE IT CREATED A GOING CONCERN

24   VALUE, WHICH IS WHAT THIS DEFENDANT CREATED.  SOME OF THE

25   CLIENTS ARE VERY MUCH STILL UNDER INVESTIGATION.  INDEED,

1  CLIENTS ON LANCE GILMAN'S LIST THAT HE BOUGHT FROM THIS

2  MAN ARE PEOPLE TALKED ABOUT ON THE VIDEO WE SUBMITTED TO

3  THE COURT.  YOUR HONOR, THAT IS A THOROUGHLY CORRUPT BOOK

4  OF BUSINESS GENERATED DURING THE TIME LISTED IN THE

5  INDICTMENT.

6      YOUR HONOR, ON 24 SEPTEMBER THIS DEFENDANT IS STILL

7  FILING DOCUMENTS AS PRESIDENT OF HALLMART, AND TWO DAYS

8  LATER THE DEFENDANT'S WIFE APPEARS TO BE PRESIDENT OF

9  HALLMART AS SHE DISSOLVES IT.

10     NOW, THE NEXT ENTRY IN OCTOBER OF '07, DEFENDANT'S

11  WIFE IS SIGNING A W-9 THAT SHE GAVE TO LANCE GILMAN AS

12  BLEASE DOING BUSINESS AS HALLMART.  YOUR HONOR, WE HAVE

13  ALL OF THESE PAPERS THAT WE CAN HAND UP.

14     YOUR HONOR, IN INTEREST OF EFFICIENCY, I'VE HANDED UP

15  THE FULL ARRAY OF THINGS THAT MIGHT COME UP.

16     ON OCTOBER 8, IT WOULD APPEAR THAT ROBIN IS NOW THE

17  HEAD OF BLEASE, DOING BUSINESS AS HALLMART.  THIS

18  TRANSACTION BETWEEN THE TWO, NOW THAT THE HOME HAS BEEN

19  SEARCHED AND THE OFFICE HAS BEEN SEARCHED, NOW THE USDA

20  HAS ADMINISTRATIVELY REVOKED DEFENDANT'S RIGHT TO ISSUE

21  CROP INSURANCE.

22     NOW, AFTER ALL OF THIS, THEY BEGIN TO TRY TO INSULATE

23  HIM FROM THE PROCEEDS, AND SHE HAS CREATED THE BLEASE

24  COMPANY ONLY THEN.  YOUR HONOR, SECONDLY ON OCTOBER 8, WE

25  KNOW, FROM OTHER EVIDENCE, AND IT IS EXHIBIT 8, THIS IS

1  SOMETHING LANCE GILMAN GAVE TO US.  WE KNOW THAT CARL, IN

2  SUBSTANCE AND IN FACT, REMAINED ACTIVE IN CONTROLLING ALL

3  OF THESE TRANSACTIONS, THIS RELATIONSHIP WITH LANCE

4  GILMAN.

5      IF WE COULD PULL UP EXHIBIT 8 IN ITS ENTIRETY.  IT

6  SAYS:  LANCE, PLEASE, WHEN YOU ISSUE CHECKS TO US FOR

7  MULTI-PERILS CROP INSURANCE, WE WOULD APPRECIATE YOU

8  SENDING US A COPY OF THE STATEMENT SO WE CAN KEEP UP WITH

9  THE PAYMENTS WE WILL BE RECEIVING.

10     YOUR HONOR, THIS IS CARL STOKES' MONEY.  HE, IN HIS

11 OWN HAND, AS YOU CAN SEE WHERE IT SAYS "THANKS, CARL", HAS

12 ASSOCIATED HIMSELF WITH THESE FUNDS.

13     MOVING FORWARD, YOUR HONOR.  APPARENTLY THE

14 TRANSACTION DRAWN UP TO SELL THE RIGHT TO COLLECT FROM

15 LANCE GILMAN FROM CARL'S HALLMART TO HIS WIFE'S BLEASE

16 COMPANY, WASN'T FINAL BECAUSE LAST WEEK, AFTER WE STARTED

17 TALKING ABOUT THIS MONEY, THEY GO TO LANCE GILMAN AND THEY

18 GET HIM TO SIGN LEGAL DOCUMENTS.  CARL HIMSELF GOES AND

19 DOES THAT.  WE DON'T HAVE THEM, JIM AYERS DOESN'T HAVE

20 THEM, GILMAN DOESN'T HAVE THEM.  THEY ARE STILL TRYING TO

21 INSULATE CARL STOKES FROM THESE PROCEEDINGS AS RECENTLY AS

22 LAST WEEK.

23     SO ULTIMATELY, YOUR HONOR, IT'S THE GOVERNMENT'S

24 POSITION THAT, AS YOU CAN SEE IN THIS LAST ENTRY, WHICH IS

25 THE ASSETS SALES AGREEMENT BETWEEN THE DEFENDANT AND

1  MR. GILMAN, THE PAYMENT WAS DUE ON THE 15TH.  WE BELIEVE

2  THAT'S STOKES' PAYMENT BUT HE'S SAYING IT'S NOT, AND WE

3  DON'T THINK HE HAS STANDING OTHERWISE.  SHE WOULD HAVE A

4  RIGHT TO CHALLENGE IT.  WE'RE NOT GOING TO MAKE OFF WITH

5  THE MONEY.  SHE HAS A RIGHT TO COME IN IN AN ANCILLARY

6  PROCEEDING, THE DETAILS WHICH MR. WEST CAN PROJECT FOR THE

7  COURT, IF NECESSARY, BUT SHE WOULD HAVE TO PURSUE THAT

8  OPTION.  IN THE MEANTIME, WE SIMPLY ASK FOR YOU TO FOLLOW

9  THE TERMS OF THE STATUTE WHICH ALLOW US TO RESTRAIN THESE

10  ASSETS PENDING TRIAL.

11  **THE COURT:**  YOUR PAPERS ALSO TALKED ABOUT AN

12  ALTERNATIVE REMEDY ASSOCIATED WITH A BOND.  TELL ME YOUR

13  VIEWS ON THAT.

14  **MR. HOWARD:**  WE WOULD WELCOME THAT.  THAT IS AN

15  ALTERNATIVE REMEDY.

16  **THE COURT:**  WHAT FORM WOULD THAT TAKE, IN YOUR

17  VIEW?

18  **MR. HOWARD:**  YOUR HONOR, THAT'S A POINT WHERE,

19  AGAIN, OUR IN-HOUSE GURU, MR. WEST, WOULD BE MOST CAPABLE

20  TO ANSWER.

21  **THE COURT:**  ALL RIGHT, I'LL HEAR FROM MR. WEST.

22  **MR. WEST:**  YOUR HONOR, IT COULD BE ANY FORM THAT

23  WOULD SATISFY US.  LIKE, FOR EXAMPLE, AN IRREVOCABLE

24  LETTER OF CREDIT MADE OUT TO THE GOVERNMENT PAYABLE IN THE

25  EVENT THAT THE FUNDS WERE ACTUALLY DETERMINED TO BE

1    FORFEITABLE OR SOME OTHER TYPE OF BOND, WHATEVER WOULD

2    ACTUALLY -- WOULD DEFINITELY BE PAID IF THE FUNDS WERE

3    ULTIMATELY FORFEITED.

4           **THE COURT:**  ALL RIGHT.  THE COURT HAS BEEN

5    HANDED AND RECEIVED GOVERNMENT'S EXHIBITS 1 THROUGH 15.

6    DID YOU WANT TO BE HEARD ON THOSE, MR. SHANAHAN?

7           **MR. SHANAHAN:**  JUST BRIEFLY, JUDGE.  THE

8    INTERESTING PART IS THEY ARE JUST PAPERS HERE, BUT THEY

9    DIDN'T ADDRESS THE ISSUE YOU ASKED ABOUT.  THEY CAN

10   CHARACTERIZE THEM AND TALK ABOUT THEM, THEY DON'T PROVE

11   ANYTHING WITHOUT HAVING SOMEBODY TESTIFYING ABOUT WHY IT

12   HAPPENED.

13       IF YOU FOLLOW THEIR OWN TIMELINE HERE, STOKES

14   INSURANCE IS SUSPENDED.  IT'S A GOVERNMENT ACTION THAT

15   TAKES PLACE.  HE CAN'T CONTINUE IN THE BUSINESS.  SO HE'S

16   GOT TO DIVEST HIMSELF.  SO HE SELLS A PORTION OF IT TO

17   GILMAN, CROP INSURANCE, AND HE SELLS EVERYTHING ELSE TO

18   HIS WIFE, THE BLEASE COMPANY.

19       WHAT'S THE INFORMATION THAT YOU HAVE IN FRONT OF YOU

20   ABOUT THAT TRANSACTION BEING LAWFUL, LEGITIMATE, OR

21   OTHERWISE?  YOU HAVE THE DISCONNECT.  THEY CAME IN IN '06,

22   THEY TAKE ACTION IN '07, AND NOW WE'RE ALL THE WAY INTO

23   '08.  NO EVIDENCE IN HERE OF WHO HIS CLIENTS WERE IN '06

24   AND WHETHER THEY ARE ATTACHED TO '08 OR '07.

25       SO ROBIN STOKES, BECAUSE SHE USED THE NAME HALLMART,

1    I THINK THEY ARE CONFUSED.  THAT'S OBVIOUSLY A TRADE NAME.

2    WHEN SHE BOUGHT THE ASSETS, SHE HAS AN ENTIRELY NEW

3    COMPANY.  THAT'S A LEGITIMATE ARMS-LENGTH TRANSACTION,

4    WHICH THERE'S NO EVIDENCE THAT IT'S NOT.  THE BURDEN IS ON

5    THEM TO SHOW THAT.  THE THRESHOLD THEY ARE NOT GETTING

6    THROUGH, IN MY OPINION, IS THERE PROBABLE CAUSE TO BELIEVE

7    THESE ASSETS ARE SUBJECT TO FORFEITURE?

8        THE NEXT STEP IS, IF THEY ARE WRONG ON THAT, THEN IT

9    DOES CREATE A PROBLEM FOR THEM ON THE GONZALES-LOPEZ.

10   THEY WANT TO TALK ALL ABOUT GONZALES-LOPEZ, BUT YOU ONLY

11   GET TO THOSE ISSUES -- THEY HAVE TO GET THROUGH THE

12   PROBABLE CAUSE ISSUE.  I DON'T THINK THERE'S ANY EVIDENCE

13   THAT THAT'S THE CASE.

14       SO ALL OF THESE DOCUMENTS LOOK GREAT.  THEY CAN SAY

15   THEY HAPPENED IN THIS PERIOD OF TIME.  THERE'S A

16   LEGITIMATE EXPLANATION AS TO WHY IT HAPPENED.  HE LOST HIS

17   LICENSE.  IF I LOST MY LAW LICENSE, WHAT WOULD I DO?  I

18   WOULD ASK SOMEBODY ELSE TO TAKE THE CASES I'VE GOT.  SO

19   THERE'S A LEGITIMATE REASON FOR DOING THAT, NOT CONSISTENT

20   WITH THE THEORY HE'S HIDING IT OR DOING SOMETHING.

21       WE'RE NOW FAST-FORWARDING, TALKING ABOUT '08

22   COMMISSIONS THAT ARE NOT MONEYS THAT DID NOT ARISE FROM

23   THE ACTIONS ALLEGED IN THE COMPLAINT.  I THINK THEY ARE

24   MISSING.  THEY DON'T GET TO THE ISSUE OF PROBABLE CAUSE.

25       NOTHING ABOUT THE FACT THAT SOMEONE INCORPORATES

SOMETHING THAT'S SUSPICIOUS OR SUSPECT ON ITS FACE.

EXHIBIT 2, THAT SOMEBODY FILES ARTICLES OF INCORPORATION,

SEEMS TO ME THEY HAVE A LEGITIMATE COMPANY, OUGHT TO START

BY DOING THAT, JUDGE.  THEY FILED EXHIBIT 3.  THAT'S

LEGITIMATE.

HERE'S THE ASSET PURCHASE AGREEMENT THAT WENT TO THE

TROUBLE OF HAVING IT DRAWN UP BY A LAW FIRM.  THEY

REPRESENT IN THEIR PLEADINGS -- PART OF THIS INFURIATES

ME -- THEY HAVE THIS BRIEF THAT HAS ALL OF THESE FACTS

THAT AREN'T SUPPORTED BY AFFIDAVIT.

THEY CLAIM GILMAN WAS REPRESENTED BY MY LAW FIRM.

I'D LIKE ONE OF THESE PEOPLE IN THIS ROOM TO GET UP ON THE

WITNESS STAND AND TESTIFY TO THAT.  IT'S A FALSE,

INACCURATE, AND MISLEADING STATEMENT UNSUPPORTED BY

AFFIDAVIT, AND THERE ARE A NUMBER OF THEM IN THEIR

PLEADING.

WHAT I'M ARGUING IS THIS AGREEMENT, LENGTHY AS IT IS,

IS SIGNED AND NOTARIZED, AND THAT'S WHAT YOU WOULD EXPECT

TO SEE IN A LEGITIMATE TRANSACTION.

A BILL OF SALE.  OH, WHAT'S ILLEGITIMATE ABOUT THAT?

IT'S A PERFECTLY DOCUMENTED TRANSACTION.  THEY HAVE THE

RIGHT TO SUBPOENA THAT INFORMATION AS PART OF THEIR GRAND

JURY PROCEEDINGS, AND THEY DID NOT.

ITEM 6 IS A DISSOLUTION.  A LOT OF COMPANIES JUST

SHOT DOWN AND GO AWAY.  THESE GUYS WENT TO THE TROUBLE OF

FILING THE APPROPRIATE DOCUMENTS WITH THE STATE OF NORTH

CAROLINA.  W-9, LEGITIMATE BUSINESS TRANSACTION.  NOTHING

ON ITS FACE IS ILLEGITIMATE.

NOW, IT IS TRUE THAT CARL STOKES HAS TO WORK FOR A

LIVING.  HE CAN'T WORK AS AN AGENT BUT HE CAN CERTAINLY

WORK IN THE COMPANY, WHICH HE DID.  "WE" REFERS TO THE

COMPANY.  IF HE HAD SAID "ME", THIS EXHIBIT 8 MIGHT BE

MEANINGFUL, JUDGE, BUT HE SAID "WE", TALKING ABOUT THE

COMPANY FOR WHICH HE'S A W-2 EMPLOYEE.

EXHIBIT 9, I'M NOT SURE WHAT THEY ARE TRYING TO SHOW

BY THIS EXHIBIT EXCEPT IT SHOWS ROBIN STOKES IS RUNNING

THE PLACE.  CORPORATE CERTIFICATE OF ASSUMED NAME.

AMAZING, THEY WENT RIGHT DOWN AND FILED THE DOCUMENTS

SAYING HERE'S EXACTLY WHAT WE'RE DOING SO THE WORLD CAN

SEE IT.

EXHIBIT 11, DOCUMENTING THE TRANSACTION.  ACTUALLY

THIS IS -- I'M NOT SURE WHAT THIS IS.  IT'S ALL THE

INFORMATION RELATIVE TO HOW GILMAN SET UP HIS COMPANY AND

I THINK IF THEY TALKED TO GILMAN, WHICH IT APPEARS THEY

HAVE, GILMAN WOULD TELL YOU HE INCORPORATED HIS OWN

COMPANY.  NO EVIDENCE THAT MY FIRM REPRESENTED GILMAN, AND

IF FACT WE DID NOT.  THE FACT GILMAN WENT DOWN AND FILED

ARTICLES OF INCORPORATION, WHAT'S THAT EVIDENCE OF?  THEY

HAVEN'T CHARGED GILMAN WITH ANY WRONGDOING.  ARE THEY

TAKING ALL OF GILMAN'S MONEY?  HAVE THEY MADE A CLAIM,

JUDGE, FOR THE -- IF GILMAN -- REMEMBER, GILMAN'S ON THE

FIRST YEAR OF THE AGREEMENT TO PAY 50 PERCENT OF THE

COMMISSIONS. WHERE'S THEIR CLAIM ON THE OTHER 50 PERCENT,

JUDGE? WHY AREN'T THEY TAKING ALL 700,000, IF THIS IS

NOTHING MORE THAN THEIR WAY OF DOING AN END RUNNING

AROUND, USING THE LAW OF FORFEITURE TO DEPRIVE MY CLIENT

OF RIGHT TO COUNSEL.

A PICTURE OF CARL STOKES AT HIS OFFICE DESK TAKEN

BACK IN 2006, I DON'T THINK HAS ANYTHING TO DO WITH

$350,000 THAT'S IN ISSUE IN THIS CASE. AND PICTURES OF

THE FARMERS, I DON'T KNOW. WHAT EVIDENCE IS THAT OF

PROBABLE CAUSE THAT THE MONEY THAT THEY SEEK TO HAVE YOU

TIE UP IN THIS FASHION IS SUBJECT TO FORFEITURE?

I DON'T THINK THEY CAN DO IT, JUDGE. THEY JUST CAN'T

CONNECT THESE TWO TRANSACTIONS IN A MEANINGFUL WAY THAT

WOULD WARRANT OR FIND PROBABLE CAUSE THAT THIS MONEY IS

SUBJECT TO FORFEITURE. IF FOR SOME REASON THE COURT DOES

FIND THAT, THAT WE WOULD REQUEST AN OPPORTUNITY TO MAKE A

SHOWING UNDER GONZALES THAT HE NEEDS THESE FUNDS.

THEY KEEP BRINGING UP THE WIFE. THE MONEY IS NOT

COMING FROM THE WIFE. THE MONEY IS COMING FROM BLEASE

COMPANY AND IT WOULD MAKE SENSE, IF YOU THINK ABOUT IT,

THAT THIS INDICTMENT THAT THE GOVERNMENT ALLEGES -- MY

CLIENT WASN'T THE RECIPIENT, WASN'T THE GUY WHO HAD EVER

MADE A CLAIM. HE WORKED FOR AN INSURANCE COMPANY. THEIR

1   CLAIM IS MY CLIENT HELPED THEM AND AS A RESULT GOT FUNDS

2   THAT HE OTHERWISE WOULDN'T BE ENTITLED TO, INCLUDING THE

3   COMMISSIONS.  AND SO IT SEEMS TO MAKE SENSE THAT THE MONEY

4   OUGHT TO COME FROM THAT, BUT I THINK THE BURDEN IS ON THE

5   GOVERNMENT TO SHOW PROBABLE CAUSE WITH REGARD TO THIS

6   MONEY, AND THEY CANNOT.  THERE'S NO EVIDENCE OF THAT

7   TRANSACTION TO BLEASE IS A SHAM, AND IT IS NOT.  AND

8   THEREFORE THE GOVERNMENT FAILED TO SHOW PROBABLE CAUSE.

9           **THE COURT:**  DO YOU HAVE A COPY OF THE GONZALES

10  CASE?

11          **MR. SHANAHAN:**  I DO.  BY THE WAY, THIS IS

12  JUSTICE SCALIA'S DECISION.  DISREGARD THE NOTE ON THE

13  FRONT PAGE, JUDGE.

14          **THE COURT:**  ALL RIGHT.  ANYTHING ELSE FROM THE

15  GOVERNMENT, MR. HOWARD?

16          **MR. HOWARD:**  YOUR HONOR, JUST ONE POINT.  I KNOW

17  THE COURT UNDERSTANDS OUR ARGUMENT, THERE'S LACK OF

18  STANDING, NO 6TH AMENDMENT VIOLATION HERE, THAT THE PROPER

19  MEANS FOR THE BLEASE CORPORATION TO CHALLENGE THIS ASSET

20  IS AN ANCILLARY -- RESTRAINING THIS ASSET WOULD BE AN

21  ANCILLARY PROCEEDING.

22      ON ONE POINT I DO WANT TO BE CLEAR.  OUR CASE LAW

23  SUBMITTED BOTH IN OUR ORIGINAL APPLICATION AND IN OUR

24  BRIEF SHOWS THAT THE FACE OF THE INDICTMENT PROVIDES

25  PROBABLE CAUSE.  TO THE EXTENT YOU WISH TO LOOK BEHIND IT,

1    WE ALSO HAVE THE AGENT'S AFFIDAVIT AND THE MATERIALS

2    BEFORE YOU.

3        WHILE MR. SHANAHAN CHALLENGES THAT THEY STACK UP TO

4    PROBABLE CAUSE ON AT LEAST ONE POINT WHERE HE EXPRESSED

5    GREAT OUTRAGE THAT WE WOULD SUGGEST HIS FIRM EVER

6    REPRESENTED LANCE GILMAN, I WOULD ASK THE COURT TO TURN TO

7    GOVERNMENT'S EXHIBIT 4, WHICH IS THE ASSET PURCHASE

8    AGREEMENT BETWEEN GILMAN AND STOKES.  THE VERY LAST PAGE,

9    THE VERY LAST PARAGRAPH, PARAGRAPH Q.  "BOTH PARTIES

10   ACKNOWLEDGE THAT SHANAHAN LAW GROUP ACTED AS COUNSEL FOR

11   BOTH BUYER AND SELLER, AND HEREBY WAIVE ANY CONFLICT OF

12   INTEREST."  THE BUYER, SIGNED BELOW, IS LANCE GILMAN.  HIS

13   FIRM REPRESENTED LANCE GILMAN.  I THINK YOU WOULD FIND THE

14   GOVERNMENT'S APPLICATION IS SOUND.

15           **THE COURT:**  ALL RIGHT.  THE COURT WILL TAKE A

16   RECESS UNTIL -- WELL, MR. SHANAHAN, DO YOU WANT TO SAY

17   ANYTHING ELSE?

18           **MR. SHANAHAN:**  THE LAST POINT I WANTED TO MAKE,

19   THE STANDING ISSUE THEY KEEP MENTIONING.  IT SEEMS ODD, I

20   THINK THEY HAVE, IN EFFECT, ACKNOWLEDGED OR FORCED

21   STANDING BECAUSE THEY ARE CLAIMING THAT THE MONEY IS IN

22   FACT STOKES'.  SO HOW -- AND THAT'S THE BASIS FOR SAYING

23   YOU SHOULD TIE IT UP.  IT'S HIS MONEY EVEN THOUGH --

24           **THE COURT:**  AS I UNDERSTAND MR. HOWARD'S

25   ARGUMENT, I'LL LET HIM CLARIFY, HIS ARGUMENT IS PRECISELY

1    IT IS MR. STOKES' MONEY AND IT OUGHT TO BE FROZEN.  BUT IF

2    HE CONTENDS IT'S NOT HIS MONEY, HE DOESN'T HAVE STANDING

3    TO COMPLAIN ABOUT IT AND ONLY BLEASE CAN COME IN HERE.

4              **MR. HOWARD:**  THAT'S CORRECT.  NOW THAT YOU

5    SUMMARIZED MY ARGUMENT, I WANT TO POINT OUT, IF THE BLEASE

6    CORPORATION IS THE ONE MAKING MONEY, WE'RE CONTENT WITH A

7    BOND FROM BLEASE.

8         SECONDLY, YOUR HONOR, SOUNDS LIKE YOU WANT TO TAKE A

9    RECESS.  MR. WEST HAS PRE-ARRANGED TRAVEL PLANS AND NEEDS

10   TO LEAVE THE BUILDING AT 11:30.  IF IT PLEASE THE COURT,

11   HE WOULD GO AHEAD AND INTEND TO DO THAT.

12             **THE COURT:**  ALL RIGHT.  THAT'S FINE.  HE'S ON

13   YOUR SIDE OF THE TABLE.  IF YOU WANT TO LET HIM GO, THAT'S

14   FINE.  I DON'T HAVE ANY PROBLEM WITH THAT.

15             **MR. SHANAHAN:**  ALL WE'RE SAYING, SEEMS LIKE A

16   CATCH 22, BUT IN ANY EVENT HE IS A THIRD PARTY BENEFICIARY

17   NOW THAT BLEASE HAS AGREED TO ALLOW -- TO MAKE HIM A LOAN

18   FOR THE 250.  HE'S A THIRD PARTY BENEFICIARY IN BLEASE'S

19   RIGHT TO PURSUE THAT CLAIM.

20             **THE COURT:**  WHAT DO YOU HAVE TO SAY TO

21   MR. HOWARD'S POINT THAT THE GOVERNMENT WOULD TAKE A BOND

22   FROM WHOMEVER?  IT'S SOMETHING TO SECURE AND I GATHER,

23   MR. HOWARD, ARE YOU TALKING ABOUT SECURING THE 350.

24   THAT'S THE AMOUNT PAYMENT.

25             **MR. HOWARD:**  I THINK IT WOULD ONLY NEED TO BE

1  250, IF THEY WOULD AGREE TO RETAIN THE OTHER HUNDRED,

2  BECAUSE ONLY 250 IS NEEDED FOR THE FEE.

3         **THE COURT:**  WHAT DO YOU HAVE TO SAY ABOUT THAT,

4  MR. SHANAHAN?

5         **MR. SHANAHAN:**  SOUNDS LIKE WE'RE NEGOTIATING A

6  SETTLEMENT, JUDGE, AND I JUST DON'T THINK THEY GET TO THE

7  PROBABLE CAUSE ISSUE.  I DON'T KNOW HOW YOU WOULD REALLY

8  STRUCTURE -- YOU KNOW, ALL OF HIS ASSETS ARE REALLY HIS

9  WIFE'S.  AGAIN, HE'S CREATING AN IMPEDIMENT TO HIS RIGHT

10 TO GET COUNSEL.  HE'S WILLING TO PUT -- BLEASE COMPANY IS

11 WILLING TO LET THE HUNDRED BE HELD, LET THE 250 BE

12 RELEASED SO HE CAN HAVE COUNSEL, AND THEN WE'LL GET ON

13 DOWN THE ROAD.

14     THE ONLY THING HE COULD DO TO PUT UP A BOND WOULD BE

15 TO PLEDGE OTHER ASSETS THAT HE HAS.  THAT'S THE PROBLEM,

16 HE DOESN'T HAVE OTHER ASSETS THAT ARE NOT TIED UP, OTHER

17 THAN HIS EQUITY, HIS SHARE OF THE ENTIRE PROPERTY.

18         **THE COURT:**  OKAY.  WE'LL TAKE A RECESS UNTIL

19 11:15 A.M.  MR. WEST, YOU ARE PERMITTED TO LEAVE TO

20 TRAVEL.

21     (RECESS TAKEN.)

22         **THE COURT:**  ANYTHING ELSE FROM THE GOVERNMENT,

23 MR. HOWARD?

24         **MR. HOWARD:**  JUST BRIEFLY TO MAKE AN EFFORT TO

25 DISTINGUISH THIS CASE, GONZALES-LOPEZ WHICH CAME UP.

1    BEFORE GONZALES-LOPEZ, A PREVIOUS HOLDING OF THE SUPREME

2    COURT WAS KAPLAN AND DRYSDALE.  IN THERE, THAT COURT HELD

3    THAT, A DEFENDANT IS NOT DENIED COUNSEL OF CHOICE, WHEN A

4    PRETRIAL ORDER FREEZES ASSETS BELIEVED SUBJECT TO

5    FORFEITURE, EVEN THOUGH THOSE ASSETS WOULD OTHERWISE BE

6    USED TO PAY FOR DEFENDANT'S COUNSEL.

7        WE BELIEVE THE MOST IMPORTANT ASPECT OF THE

8    GONZALES-LOPEZ DECISION ARE THE LAST WORDS OF THE MAJORITY

9    OPINION.  SECTION FOUR, JUST BELOW THE HEADNOTE, PAGE 151

10   OF THE WESTLAW PRINT-OUT, WHICH SAYS:  NOTHING WE HAVE

11   SAID TODAY CASTS ANY DOUBT OR PLACES ANY QUALIFICATION

12   UPON OUR PREVIOUS HOLDINGS THAT LIMIT THE RIGHT TO COUNSEL

13   OF CHOICE.

14       THEY ARE TALKING ABOUT KAPLAN AND DRYSDALE.

15           **THE COURT:**  ANYTHING ELSE, MR. SHANAHAN?

16       **MR. SHANAHAN:**  NO, SIR.

17           **THE COURT:**  MR. HOWARD, DO YOU THINK THAT THE

18   GILMAN AGENCY NEEDS NOTICE BEFORE THIS COURT WERE TO ISSUE

19   AN INJUNCTION?

20           **MR. HOWARD:**  YOUR HONOR, I UNDERSTAND THAT

21   MR. AYERS IS PREPARED AND READY TO ACCEPT AN ORDER FROM

22   THE COURT AND WILL GIVE HIM DIRECTION RIGHT AWAY.

23           **THE COURT:**  AND YOUR PROPOSED INJUNCTION,

24   MR. HOWARD, DOESN'T MENTION THE BLEASE COMPANY.  I THINK

25   IT NEEDS TO BE NAMED.  OR DO YOU THINK THAT'S JUST WITHIN

1  YOUR PROPOSED LANGUAGE ABOUT PERSONS IN ACTIVE CONCERT OR

2  PARTICIPATION WITH THE DEFENDANT, ON PAGE THREE?

3        **MR. HOWARD:**  YOUR HONOR, WE THINK THAT IS BROAD

4  ENOUGH TO EMBRACE THAT FULL UNIVERSE, TO INCLUDE THE

5  BLEASE CORPORATION.  I COULDN'T IMAGINE MR. GILMAN OR HIS

6  AGENCY WOULD BE CONFUSED AS TO THE PAYMENT AT ISSUE.

7     WE ARE GLAD TO MOVE THE COURT TO INCLUDE IT IN

8  GREATER SPECIFICITY.  WE WOULD HAVE NO OBJECTION TO THAT

9  INCLUSION.

10        **THE COURT:**  MR. HOWARD, YOU ALSO FILED A MOTION

11  TO KEEP YOUR LATEST FILING UNDER SEAL.  DO YOU WANT ALL

12  THE PAPERS STILL TO BE UNDER SEAL IN THIS CASE?

13        **MR. HOWARD:**  YOUR HONOR, THAT'S A VERY GOOD

14  QUESTION.  I ONLY DID THAT BECAUSE THE COURT'S ORDER

15  CALLING FOR THIS HEARING NOTED THEY SHOULD ALL BE SEALED.

16  IF THERE'S NO OBJECTION FROM THE DEFENSE, I DON'T SEE ANY

17  REASON WHY THEY NEED TO REMAIN UNDER SEAL.

18        **THE COURT:**  WHAT'S YOUR VIEW ON THAT, MR.

19  SHANAHAN?

20        **MR. SHANAHAN:**  OTHER THAN THE FACT HIS BRIEF

21  CITES ALL SORTS OF FACTS THAT AREN'T SUPPORTED, WE'RE A

22  LITTLE CONCERNED ABOUT IT.  OTHER THAN THAT, I SUPPOSE --

23  I CAN'T THINK OF A REASON THAT IT WOULD NEED TO BE SEALED.

24        **THE COURT:**  ALL RIGHT.  THE COURT IS GOING TO

25  UNSEAL THE PLEADINGS.  WELL, THE PAPERS THAT HAVE BEEN

1   FILED IN CONNECTION WITH THE GOVERNMENT'S MOTION,

2   APPLICATION, PROPOSED ORDER, THE MEMORANDUM OF LAW THAT

3   THEY FILED UNDER SEAL.  SO TO THE EXTENT THERE ARE ANY

4   MOTIONS ON THE DOCKET THAT ARE LIVE MOTIONS THAT NEED TO

5   BE RULED ON IN CONNECTION WITH SEALING ISSUES, THE MOTIONS

6   TO SEAL ARE EITHER LIFTED OR THE MOTIONS TO SEAL ARE

7   DENIED.  THE PAPERS THAT HAVE BEEN PREVIOUSLY SEALED CAN

8   BE UNSEALED AND CAN BE MADE A PART OF THE RECORD IN THIS

9   CASE THAT'S AVAILABLE TO THE PUBLIC.

10      THE COURT NOTES THAT 21 USC, SECTION 853(E)(1)

11  PROVIDES THAT, "UPON APPLICATION OF THE UNITED STATES, THE

12  COURT MAY ENTER A RESTRAINING ORDER OR INJUNCTION, REQUIRE

13  THE EXECUTION OF A SATISFACTORY PERFORMANCE BOND OR TAKE

14  ANY OTHER ACTION TO PRESERVE THE AVAILABILITY OF PROPERTY

15  DESCRIBED IN SUBSECTION A OF THIS SECTION FOR FORFEITURE

16  UNDER THIS SECTION."

17      SUBPARAGRAPH A OF 21 USC SECTION 853(U)(1)(A) STATE,

18  "UPON THE FILING OF AN INDICTMENT OR INFORMATION CHARGING

19  A VIOLATION OF THIS SUBCHAPTER OR SUBCHAPTER 2 OF THIS

20  CHAPTER FOR WHICH CRIMINAL FORFEITURE MAY BE ORDERED UNDER

21  THIS SECTION AND ALLEGING THAT THE PROPERTY WITH RESPECT

22  TO WHICH THE ORDER IS SOUGHT WOULD, IN THE EVENT OF

23  CONVICTION, BE SUBJECT TO FORFEITURE UNDER THIS SECTION."

24      THIS IS THE PROVISION WHICH THE GOVERNMENT IS SEEKING

25  TO PROCEED IN THIS CASE WITH A CROSS-REFERENCE TO 18 USC

1   SECTION 982(B)(1).  THAT PORTION OF THE UNITED STATES CODE

2   CROSS-REFERENCES 21 USC, SECTION 853(E)(1).  THE COURT

3   NOTES THAT THE PROPERTY AT ISSUE IN THIS -- WELL, THE

4   COURT NOTES THE UNITED STATES HAS MADE AN APPLICATION IN

5   THIS COURT PURSUANT TO 21 USC, SECTION 853(E)(1)(A) FOR

6   RESTRAINING ORDER TO PRESERVE THE AVAILABILITY OF CERTAIN

7   PROPERTY THAT IS THE SUBJECT -- EXCUSE ME -- THAT IS

8   SUBJECT TO FORFEITURE IN THE ABOVE-STYLED CRIMINAL ACTION.

9       AFTER FULLY CONSIDERING ALL THE EVIDENCE PRESENTED AT

10  THE HEARING, ALL THE INFORMATION PRESENTED BY WAY OF

11  ARGUMENT FROM COUNSEL, AND ALL EVIDENCE IN THE RECORD, AND

12  HAVING FULLY CONSIDERED THE ARGUMENTS OF COUNSEL, THE

13  COURT DOES FIND THAT THERE IS REASONABLE CAUSE TO ENTER A

14  RESTRAINING ORDER TO PRESERVE THE SUBJECT PROPERTY.

15      THE COURT NOTES THAT A FEDERAL GRAND JURY IN THE

16  EASTERN DISTRICT OF NORTH CAROLINA HAS RETURNED AN

17  INDICTMENT AGAINST ROBERT CARL STOKES ON CHARGES OF

18  CONSPIRACY TO MAKE FALSE STATEMENTS, IN VIOLATION OF 18

19  USC, SECTION 1014; TWO SUBSTANTIVE COUNTS OF AIDING AND

20  ABETTING, MAKING OF FALSE STATEMENT, IN VIOLATION OF

21  SECTION 1014 AND 2; AND CONSPIRACY TO COMMIT MONEY

22  LAUNDERING, IN VIOLATION OF 18 USC, SECTION 1956(H).

23      THE INDICTMENT ALLEGES CRIMINAL FORFEITURE UNDER 18

24  USC, SECTION 981(A)(1)(C), AS MADE APPLICABLE BY 28 USC,

25  SECTION 2461 AND 18 USC, SECTION 982 OF CERTAIN PROPERTY

IN WHICH ROBERT CARL STOKES HOLDS AN INTEREST, TO WIT,

$3.4 MILLION, AS WELL AS ANY SUBSTITUTE ASSETS, SHOULD

SAID FUNDS NOT BE LOCATED.

THE COURT NOTES THE PROPERTY AT ISSUE IN THIS CASE IS

A $350,000 PAYMENT THAT IS DUE FROM GILMAN INSURANCE

AGENCY TO BLEASE COMPANY.  THIS TRANSACTION IS AS A RESULT

OF NUMEROUS OTHER TRANSACTIONS.  THE EVIDENCE INDICATES

THAT THE DEFENDANT WAS THE PRESIDENT AND OPERATED THE

HALLMART INSURANCE AGENCY.  THAT AGENCY SOLD ITS ASSETS TO

GILMAN INSURANCE AGENCY, AS REFLECTED IN GOVERNMENT'S

EXHIBIT 4.  AS A RESULT OF THAT AGREEMENT, GILMAN

INSURANCE COMPANY OWED HALLMART CERTAIN PAYMENTS DUE ON

DECEMBER 15, INCLUDING A PAYMENT OF $350,000.

AFTER THAT TRANSACTION, HALLMART DISSOLVED.  BLEASE

ACQUIRED THE ASSETS OF HALLMART.  PURSUANT TO PARAGRAPH 3D

OF GOVERNMENT'S EXHIBIT 4, THE PAYMENT NOW IS DUE TO

BLEASE FROM GILMAN.  THE DEFENDANT'S WIFE IS THE PRESIDENT

AND OWNER OF BLEASE.

BLEASE COMPANY, ACCORDING TO THE EVIDENCE, HAS AGREED

TO LOAN $250,000 TO THE DEFENDANT OUT OF THE $350,000 THAT

IS OWED BY GILMAN INSURANCE AGENCY.  BLEASE HAS INSTRUCTED

GILMAN INSURANCE TO PAY $250,000 TO THE DEFENDANT'S

LAWYER'S LAW FIRM, SHANAHAN LAW GROUP, AND PAY A HUNDRED

THOUSAND DOLLARS TO BLEASE.

THE GOVERNMENT SEEKS TO RESTRAIN THIS PROPERTY.  THE

1    COURT DOES FIND THAT THE EVIDENCE IN THE RECORD IN THIS

2    CASE, AFTER THE COURT HAS FULLY CONSIDERED IT ALL,

3    ESTABLISHES SUFFICIENT PROBABLE CAUSE FOR THE ISSUANCE OF

4    A RESTRAINING ORDER.

5        IF ROBERT CARL STOKES IS CONVICTED OF THE CHARGES

6    ALLEGED IN THE INDICTMENT, THE SUBJECT PROPERTY WOULD BE

7    SUBJECT TO FORFEITURE UNDER 18 USC, SECTION 981(A)(1)(C)

8    AND 982, AT LEAST UP TO THE VALUE OF $3.4 MILLION AS

9    SUBSTITUTE ASSETS.  THERE'S A NEED TO PRESERVE THE

10   AVAILABILITY OF THE SUBJECT PROPERTY THROUGH THE ENTRY OF

11   THE ORDER REQUESTED HEREIN.  THAT NEED OUTWEIGHS THE

12   HARDSHIP OF ANY PARTY AGAINST WHOM THE ORDER IS TO BE

13   ENTERED.  SHOULD THE PAYMENT BE MADE, THE DEFENDANT COULD

14   SPEND, INCUMBER, OR OTHERWISE DISSIPATE OR PLACE THE MONEY

15   BEYOND THE JURISDICTION OF THE COURT.

16       ANY THIRD PARTY CLAIMS TO THE SUBJECT PROPERTY MAY BE

17   PROPERLY BROUGHT AND RESOLVED IN AN ANCILLARY PROCEEDING

18   CONDUCTED BY THE COURT FOLLOWING THE EXECUTION OF THE

19   PRELIMINARY ORDER OF FORFEITURE AND IN ACCORDANCE WITH THE

20   PROVISIONS OF 21 USC SECTION 853(N).

21       IT IS HEREBY ORDERED AND DECREED THAT EFFECTIVE

22   IMMEDIATELY, ROBERT CARL STOKES, HIS AGENTS, SERVANTS,

23   EMPLOYEES, ATTORNEYS, FAMILY MEMBERS, AND THOSE PERSONS OF

24   ACTIVE CONCERT OR PARTICIPATION WITHIN, INCLUDING BLEASE

25   COMPANY, INC., ARE HEREBY RESTRAINED, ENJOINED, AND

1    PROHIBITED WITHOUT PRIOR APPROVAL OF THIS COURT AND UPON

2    NOTICE TO THE UNITED STATES AND OPPORTUNITY FOR THE UNITED

3    STATES TO BE HEARD, FROM THE RECEIPT OF ANY FUNDS FROM THE

4    GILMAN INSURANCE SERVICES, INCORPORATED, PURSUANT TO THE

5    ASSET PURCHASE AGREEMENT DATED SEPTEMBER 21, 2007.

6        IT IS FURTHER ORDERED THE PAYOR, GILMAN INSURANCE

7    SERVICES, SHALL MAKE THE PAYMENT DUE HALLMART INSURANCE

8    AGENCY, INC., ON OR ABOUT DECEMBER 15, 2008, AS WELL AS

9    FUTURE PAYMENTS DUE UNDER THE ASSET PURCHASE AGREEMENT TO

10   THE INTERNAL REVENUE SERVICE, PAYABLE TO THE UNITED STATES

11   TREASURY, WHICH PAYMENT SHALL BE HELD BY THE GOVERNMENT

12   PENDING DISPOSITION BY ORDER OF THIS COURT.

13       IT IS FURTHER ORDERED THAT THE UNITED STATES OR ANY

14   SUBJECT OF THIS ORDER MAY SEEK MODIFICATION OF THIS ORDER

15   IF IT IS DEEMED NECESSARY BY THEM TO PRESERVE THEIR

16   INTEREST IN THE SUBJECT PROPERTY.  IT IS FURTHER ORDERED

17   THAT ANY SUBJECT OF THIS ORDER SHALL BE PERMITTED TO

18   EXECUTE A SATISFACTORY PERFORMANCE BOND, PURSUANT TO 21

19   USC, SECTION 853(E)(1), AS AN ALTERNATIVE TO THE RESTRAINT

20   OF THE SUBJECT PROPERTY.  AFTER NOTICE TO THE UNITED

21   STATES AND AN OPPORTUNITY TO BE HEARD, THE COURT SHALL

22   DETERMINE WHETHER ANY PROPOSED BOND IS A SATISFACTORY

23   PERFORMANCE BOND.

24       IT IS FURTHER ORDERED THAT THE SECRETARY OF THE

25   TREASURY OR HIS DESIGNEE SHALL PROMPTLY SERVE A COPY OF

1   THIS RESTRAINING ORDER UPON ROBERT CARL STOKES, THE

2   HALLMART AGENCY, INC., BLEASE COMPANY, INC., AND GILMAN

3   INSURANCE SERVICES, INC., AND SHALL MAKE A RETURN THEREON

4   REFLECTING THE DATE AND TIME OF SERVICE.

5       IT IS FURTHER ORDERED THAT THIS ORDER, AS WELL AS THE

6   MOTION MADE BY THE GOVERNMENT, SHALL BE SEALED UNTIL --

7   EXCUSE ME -- THIS RESTRAINING ORDER SHALL REMAIN IN FULL

8   FORCE AND EFFECT UNTIL FURTHER ORDER OF THE COURT.  EXCUSE

9   ME -- THIS ORDER SHALL REMAIN IN FULL FORCE AND EFFECT

10  UNTIL FURTHER ORDER OF THE COURT.

11      THE COURT HAS REVIEWED THE GONZALES-LOPEZ CASE.  THE

12  COURT REVIEWED THE MONSANO CASE, THE COURT HAS REVIEWED

13  KAPLAN AND DRYSDALE.  THE COURT BELIEVES GONZALES-LOPEZ IS

14  DISTINGUISHABLE AND THAT THE MAJORITY OPINION IN

15  GONZALES-LOPEZ DOES NOT ALTER, AFFECT THE SUPREME COURT'S

16  ANALYSIS IN KAPLAN AND DRYSDALE.

17      THE COURT ALSO HAS TAKEN INTO ACCOUNT AND REVIEWED

18  ALL THE CASES CITED IN THE VARIOUS PAPERS SUBMITTED IN

19  THIS CASE.

20      MR. HOWARD, ANYTHING ELSE WE NEED TO TAKE UP TODAY?

21  THE COURT WILL ENTER A WRITTEN ORDER.

22      **MR. HOWARD:**  NOTHING FROM THE GOVERNMENT, YOUR

23  HONOR.  THANK YOU.

24      **THE COURT:**  ANYTHING ELSE?

25      **MR. SHANAHAN:**  YOUR HONOR, WE WOULD ASK YOU ADD

1   TO THE ORDER -- IT'S AN IMMEDIATELY APPEALABLE ORDER, TO

2   CERTIFY FOR APPEAL TO THE 4TH CIRCUIT THE STATED ACTIONS

3   AND ALL OTHER ACTIONS IN THIS CASE.

4           **THE COURT:**  ALL RIGHT.  THE COURT WILL ADDRESS

5   THAT IN THE WRITTEN ORDER.  YOU MOVE TO STAY ALL

6   PROCEEDINGS?

7           **MR. SHANAHAN:**  YES, SIR.

8           **THE COURT:**  OKAY.  ALL RIGHT.  THE COURT WILL BE

9   IN RECESS.

10

11

12

13

14

15

16

17

18

19

20                          END OF TRANSCRIPT

21

22

23

24

25

```
1                        CERTIFICATE

2        THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

3   PROCEEDINGS TAKEN AT THE CRIMINAL SESSION OF UNITED STATES

4   DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF THE

5   PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

6   TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

7        THIS THE 10TH DAY OF MARCH, 2009.

8

9                           /S/DONNA J. TOMAWSKI

10                          DONNA J. TOMAWSKI
                            OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```